**SIERRA CLUB et al., Plaintiffs,**

v.

**James T. LYNN, Secretary of Housing and Urban Development, et al., Defendants.**

**Civ. A. No. SA72CA77.**

United States District Court,
W. D. Texas,
San Antonio Division.

July 17, 1973.

On Motion for Reconsideration
Aug. 21, 1973.

---

Phillip D. Hardberger, San Antonio, Tex., for plaintiffs.

Ferd C. Meyer, Jr., and Jon C. Wood, San Antonio, Tex., for intervenor, Edwards Underground Water District.

Keith Burris, Asst. Dist. Atty., San Antonio, Tex., for intervenor, Bexar County.

Hugh P. Shovlin, Asst. U. S. Atty., Seagal V. Wheatley, San Antonio, Tex., for defendants.

M. Lynn Taylor, Asst. Atty. Gen., Austin, Tex., for intervenor, Texas Water Quality Board.

## OPINION AND ORDERS

SPEARS, Chief Judge.

Plaintiffs, four citizen groups, (the Sierra Club, the Citizens for a Better Environment, the League of Women Voters of the San Antonio Area, and the American Association of University Women, San Antonio Branch) and their

individual members, filed suit against James T. Lynn, Secretary of the United States Department of Housing and Urban Development (HUD), and San Antonio Ranch, Ltd., alleging that the development of San Antonio Ranch New Town (SAR), a proposed Title VII new community to be located in northwest Bexar County, Texas, and partially financed by $18,000,000 in bonds guaranteed by the United States, would violate the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C.A. § 4321 et seq., and the Urban Growth and New Community Development Act of 1970 (Title VII), 42 U.S.C.A. § 4501 et seq. Subsequently, the Edwards Underground Water District (EUWD) and Bexar County, Texas, intervened on behalf of the plaintiffs, and the Texas Water Quality Board (TWQB) intervened on behalf of the defendants. During the trial, EUWD amended its original complaint, alleging that the development of SAR also would violate the Water Pollution Prevention and Control Act of 1972 (Water Pollution Control Act), 33 U.S.C.A. § 1251 et seq.

The proposed site for SAR is located in the northwest quadrant of Bexar County, approximately 20 miles from downtown San Antonio, 10 miles from the South Texas Medical Center, and 6 miles from the University of Texas at San Antonio. SAR will cover 9,318 acres and have an ultimate population of 87,972 people living in 28,676 housing units. Development is to be staggered in 5-year phases over the next 30 years. When completed, the land-use will break down as follows: residential, 45% (25% of which will be low and moderate income housing); retail, 2%; industrial, 13%; open space, 24%; technical center, 5%; roads, 7%; schools, 4%. The site is presently in a virtually undisturbed natural condition. Fifteen percent of the acreage is basically flat with agriculturally productive soil; 85% is located in the Texas Hill Country, an area characterized by rocky soil with elevation differentials of from 100 to 200 feet.

At the outset, this Court feels that the parameters set out in its Order of January 23, 1973, with regard to the scope of review of the administrative decision in this case, bear reiteration; (1) This Court recognizes that it "is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971); (2) Limitation number one will not, however, prohibit this Court from making a "substantial inquiry," based upon "a thorough, probing, in-depth review" of the Secretary's decision. Id. at 415, 91 S.Ct. at 823. In other words, no matter what this Court may think of the decision of the Secretary on the merits, it is not empowered to overrule that decision unless the decision is found to have been made in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). In conducting this review, numerous pre-trial conferences were held, nine days of testimony, comprising 1,920 pages of transcript, were heard, and three environmental impact statements, as well as seven volumes of HUD's administrative record were reviewed.

As a result of the review process, this Court has already held in its orders of January 23, 1973, March 7, 1973, and May 21, 1973, *inter alia,* that:

(1) Plaintiffs have standing to sue. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed. 2d 636 (1972).

(2) This Court has jurisdiction.

(3) The scope of review, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), involves a determination of whether the decision by the Secretary of Housing and Urban Development was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

(4) In reaching a decision as to whether or not the Secretary's decision was arbitrary, etc., the facts would be assembled in a

hearing more nearly resembling a trial *de novo* than a substantial evidence proceeding, and the Court would make a "substantial inquiry" based upon a "thorough, probing, in-depth review" of the Secretary's actions. See *Overton Park,* supra; Allison v. Froehlke, 470 F.2d 1123 (5th Cir. 1972); Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289 (8th Cir. 1972).

(5) All relief prayed for by the plaintiffs, except attorneys' fees, was denied.

The purpose of this Opinion is merely to recite the facts supporting the Court's conclusions previously entered and, where appropriate, to expand the reasoning behind those conclusions. Nothing stated herein is to be construed as in any way modifying this Court's past actions.

## I Applicability of Title VII to Sar

A reading of the legislative history of Title VII reveals that Congress was attempting therein to treat the multi-faceted problem of urban development known as "urban sprawl." It indicates that Title VII "would provide for the development of a national urban growth policy to encourage and support the more rational and orderly growth of the Nation's communities." U.S.Code Cong. and Adm.News, 91st Cong., 2d Sess., at 5582, 5586 (1970). In attempting to reach this goal, Congress recognized a need to encourage the building of new communities by helping the private sector overcome the traditional barriers to a new community development, i. e., the problems of raising a large initial investment which would yield a delayed, irregular cash return; of assembling suitable sites of sufficient size; and in coordinating site and related improvements among all involved public and private sectors. Id. at 5587. The assistance provided by the Government, and administered by the Community Development Corporation, is in the form of a guarantee that the bondholders will receive a return of their investment in the event of default by the developer.

Congress set out the eligibility requirements for a new community loan guarantee in 42 U.S.C.A. § 4513. In determining that SAR was eligible for such assistance, HUD spent two and one-half years, from February, 1970, until November, 1972, reviewing the project plans. A review of the testimony of Anthony P. DeVito, chief of physical and social planning for the Office of New Community Development (NCD), reveals that the following process, in skeletal form, occurred over the two and one-half years. A confidential meeting, exploratory in nature, between the developer and members of NCD, was held on February 20, 1970. The developer then prepared a "preapplication proposal" which generally outlined the project and its major problems, and submitted it to NCD on March 16, 1970. Subsequently, having received an invitation to make formal application, the developer formalized a final land, social, and community plan which he submitted to NCD, along with $10,000, on November 12, 1970. From then until August, 1971, a full review was undertaken by NCD, in which the opinions of many local governmental agencies were sought. Three Environmental Impact Statements were later issued (September 13, 1971; January 20, 1972; and August 24, 1972), and the offer of commitment was made on February 23, 1972, the date this suit was commenced.

After reviewing all of the evidence, HUD concluded that SAR was eligible for new communities assistance, because, pursuant to § 4513(a)(1), it would provide "an alternative to disorderly urban growth, helping preserve or enhance desirable aspects of the natural and urban environment." HUD considered the fact that the northwest quadrant of Bexar County was growing at a rapid rate, and would continue to so grow; especially given the proximity of the University of Texas at San Antonio, and the South Texas Medical Center. In addition, it

was found that the Alamo Area Council of Governments (a sixteen-member, multi-governmental agency), the Water Board of the City of San Antonio, the City of San Antonio Public Service Board, the Texas Water Quality Board, the Governor's office, and the Northside Independent School District had reviewed the project and decided that SAR was consistent with the comprehensive regional plan. Finally, the undisputed evidence reflected that neither governmental controls over land use nor comprehensive and cohesive water resource management plans then existed in this area of Bexar County. This last finding was indeed significant, for as a result of the lack of planning, disorderly growth would probably continue to accelerate at a rapid rate for at least the next decade.

Plaintiffs complain bitterly that SAR is ineligible for Title VII assistance because HUD did not adequately consider alternative sites (this argument is separate and distinct from the similar allegation that, under NEPA, alternatives must be discussed in the Environmental Impact Statement). This Court finds nothing in Title VII, nor in its legislative history, that requires HUD to seek out alternative developers or large tracts of land for possible new community development. Title VII requires HUD to approve or disapprove applicants for assistance pursuant to 42 U.S. C.A. § 4513, and it cannot approve a new community which it determines falls outside the guidelines established by Congress. There can be no merit to the plaintiffs' claim that HUD cannot approve an otherwise eligible project merely because they have discovered vacant land in an area that they believe may be better suited for a new community than the existing site. In addition, insofar as this litigation is concerned, plaintiffs have failed to show that there are any alternative sites that would meet all the other eligibility requirements of Title VII in the San Antonio area.

Pursuant to the above, this Court holds that HUD made neither an arbitrary nor capricious decision, nor one that constituted an abuse of discretion, nor one that otherwise was not in accordance with law, when it found, with respect to SAR that:

(1) The project will provide an alternative to disorderly urban growth;

(2) It will be economically feasible, in that it will capture more than 15% of the projected growth of Bexar County, because of its wide range of housing amenities and the superior environment;

(3) It will contribute to the welfare of the entire area, as existing septic tanks will be replaced with storm and sanitary sewers, and as industrial and commercial facilities will be placed in a setting encompassing a broad price range of housing;

(4) It is consistent with comprehensive physical and social planning;

(5) It has received all governmental reviews and approvals required by State or local law;

(6) It will contribute to desirable living conditions in the community, and will be characterized by well balanced and diversified land use patterns, and will include or be served by adequate public, community, and commercial facilities;

(7) It makes substantial provision for housing within the means of persons of low and moderate income;

(8) It will make significant use of advances in design and technology with respect to land utilization, materials and methods of construction, and the provision of community facilities and services; and

(9) A basis of financial, technical, and administrative ability which demonstates capacity to carry out the program with reasonable assurance of its completion has been shown.

In conclusion, it should be noted that, as SAR represents the only community

with land-use controls within the recharge zone of the Edwards Underground Reservoir, the vital source of water for the City of San Antonio, it represents an extremely vital vehicle to capture and control growth in a very sensitive geological area. The project will prove to be an alternative to the uncontrolled urban sprawl that will most probably emanate from the University of Texas at San Antonio and its environs if SAR is prohibited from being completed. Hopefully, the project may serve as a model for future urban development in the San Antonio area.

## II  Applicability of NEPA to SAR

█ There is no doubt that HUD's action in approving the SAR project comes within the ambit of "major federal actions significantly affecting the quality of the human environment," 42 U.S.C.A. § 4332(C), thereby subjecting such action to the requirements of NEPA. HUD has made a loan guarantee of $18,000,000 for a new community proposed to be located on a portion of the recharge zone of the Edwards Aquifer, an underground water supply constituting the sole supply of water for the City of San Antonio. It is the plaintiffs' contention that, due to the potential hazard of polluting this water supply, a worse site for a Title VII new community in the San Antonio area could not have been chosen.

To better understand the nature of the lawsuit, a brief description of the geology in the area is required. The independent geologist employed by HUD to study the environmental impacts of SAR described the aquifer as follows:

The term "Edwards Aquifer" has been used . . . to designate a section of Lower Cretaceous rocks from which moderate to high quantities of ground water have been produced in the past. Nearly all the earlier reports mention it as Edwards and Associated Limestones. [Dr. Sergio] Garza (1966) states [that it] "—includes Georgetown, Edwards, and Commanche Peak limestones." The

Edwards Aquifer is the principal source of ground water from Bracketville, Texas, on the west, [through San Antonio and New Braunfels,] to San Marcos, Texas, on the east.
The aquifer region covers about 3.5 million acres, with a width of from 5 to 45 miles and a length of approximately 175 miles.

Ground water is found under two sets of conditions within the aquifer, depending upon which side of the Balcones Fault Zone it is located. Northwest of the fault, the "upthrown" side, where the limestone is honeycombed with many vertical and horizontal cracks, ground water occurs under normal, unconfined ground-water table conditions. Southeast of the fault line, the "downthrown" side, the water is located in an underground reservoir; i. e., the water occurs under confined or artesian conditions. As a result of the vertical fault, the rocks on the southeast side of the fault zone were down-dropped and the Edwards Aquifer is found overlain by rocks of younger age and of lower permeability, causing the confining condition.

The fault zone crosses the SAR site, at what is known as the Haby Crossing Fault, in basically an east-west direction, leaving approximately 7000 acres to the north and 2000 acres to the south. The ground-water conditions on SAR are no different than those described for the rest of the aquifer.

It is estimated that the artesian section of the aquifer (i. e., the reservoir from which San Antonio draws its water) has an average annual recharge of about 500,000 acre feet. Three sources of this recharge are generally recognized. The first, and least significant, is the recharge from rain falling directly on the exposed limestone (i. e., the "outcrop" area) in the upthrown region. Rain falling on the outcrop seeps down through the honeycombed passages in the limestone, and eventually filters its way into the reservoir. The second source, from which a majority of the recharge takes place, occurs where surface

streams transverse the Balcones Fault Zone, and the water enters the aquifer through fractures (i. e., either faults or joints). There are 14 of these major stream beds that flow across the fault zone, none of which is found on the SAR site. The third form of recharge is the underflow in the reservoir from one area to another. The flow of water on the downthrown side is southerly, while the ground-water movement on the upthrown side is principally from west to east.

With the passage of NEPA, a national policy was established to encourage productive and enjoyable harmony between man and his environment. 42 U.S.C.A. § 4321. Suits brought to enforce this policy are usually three-tiered, and based upon the language found in 42 U.S.C.A. § 4332(C). The first two issues present ordinary questions of law, while the last presents a question of fact reviewable pursuant to the Administrative Procedure Act. First, there is the threshold determination of whether or not it is necessary to file an Environmental Impact Statement. See Save Our Ten Acres v. Kreger, 472 F.2d 463 (5th Cir. 1973). As there have been three Environmental Impact Statements filed in this case, the question need not be explored by this Court. The second issue presents a check list, i. e., whether all the components required by 42 U.S.C.A. § 4332(C)(i)-(v) have been included within the Environmental Impact Statement. Finally, having determined that a sufficient statement has been filed, was the determination by the federal agency to proceed with the project arbitrary, etc.?

**(A)** *Is There A Sufficient Environmental Impact Statement?*

The evidence shows that upon learning the proposed SAR site was above the aquifer, HUD took steps to insure that the quality of the water would be protected. The developer was required to retain a geologist to review the project. As comments from the Draft Environmental Impact Statement were re-turned to HUD, it became apparent that many people were concerned over the possible adverse environmental aspects of the project. The Water Quality Advisory Review Board, composed of 18 public agencies who volunteered to review the water aspects of the project, was established, and functioned from April 24, 1972, until June 23, 1972, by holding four separate public meetings. The comments of these 18 agencies were forwarded to HUD for consideration. HUD required the developer to again have the Texas Water Quality Board review the project, and on June 28, 1972, that agency gave its approval. In addition, as indicated, HUD retained its own independent geologist to review the project independently, and he approved the project.

HUD also secured comments upon the three Environmental Impact Statements, as required by 42 U.S.C.A. § 4332. Comments by 13 public agencies were sought on the Draft Environmental Impact Statement of September 13, 1971. Of those agencies, 7 filed written comments with HUD. In addition, 9 other public agencies and citizen groups volunteered comments upon the Statement. These comments were reviewed and attached to the Final Environmental Impact Statement of January 20, 1972, which was circulated for review among the 16 organizations which commented on the Draft Statement. Finally, the Addendum to the Final Environmental Impact Statement of August 24, 1972, was circulated among 38 public agencies and groups for comment.

Five areas of concern which must be adequately covered in the Environmental Impact Statement are delineated in NEPA, 42 U.S.C.A. § 4332(C)(i)-(v). These five areas are covered adequately in the Addendum of August 24, 1972.

First, there is an analysis of the environmental impact of HUD's proposed action. As recognized in the statement, the project will result in the conversion 9,318 acres of virgin land to a planned new community which provides housing, community facilities, employment cen-

ters, and other amenities. By careful planning, damage to the environment will be minimal. There is a discussion of the natural characteristics of the SAR location, including an analysis of the soils, proposed storm drainage facilities, existing topography and vegetation, the climate, the wildlife and plants unique to the area and plans to preserve them, archeological sites in the project area, and SAR's water supply.

Second, the adverse environmental effects which cannot be avoided are recognized. As stated above, since the site is presently in a natural state, construction will inevitably change some of the site's current elements. Paving will increase the runoff of diffused surface water, thereby reducing retained soil moisture. On the site there will be an increase in noise levels, the number of automobiles, thermal emissions, and the amount of wastes to be disposed. Also, there is the possibility that the development of SAR may affect surrounding areas, by attracting construction on adjacent property.

Third, the alternatives to the proposed action are discussed. These include taking no action, the selection of an alternative site, and the use of the same site for a new community with a different design.

Fourth, the relationship between short-term uses of the environment, and the maintenance and enhancement of long-term productivity are discussed.

Fifth, the irreversible and irretrievable commitments of resources as a result of the project are designated.

■ In the opinion of this Court, the Environmental Impact Statement, though possibly not completely exhaustive in every respect, is sufficient to permit a reasoned decision as to the environmental effects of SAR. This is especially true if one reads the 67 exhibits, consisting of *inter alia*, maps, letters and reports, which comprise appendices A and B. Thus, the Environmental Impact Statement will serve the purpose for which it was required. As it was compiled by NCD, it shows that that agency gave thought to the environmental factors involved in this project. The Statement also meets the requirement of being a full disclosure of the environmental facts. See Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 697 (2d Cir. 1972). In addition, it "represents an accessible means for opening up the agency decision-making process and subjecting it to critical evaluation by those outside the agency, including the public." Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 351 (8th Cir. 1972). Therefore, this Court holds that the Addendum to the Final Environmental Impact Statement, issued August 24, 1972, meets all the requirements for the "detailed statement" required by NEPA, 42 U.S.C.A. § 4332(C).

(B) *Was the decision of the Secretary in violation of the Administrative Procedure Act?*

Having decided that the Environmental Impact Statement meets the requirements of NEPA, the Court must answer the question of whether or not the decision by the Secretary of HUD was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). It is the position of the plaintiffs that the decision was arbitrary, etc., because the Secretary "has taken and is in the process of taking actions . . . which violate the National Environmental Policy Act by failing to protect the Edwards Underground Water Reservoir and thereby the water supply of San Antonio from the risk, and indeed likelihood, of pollution. . . ."

The studies conducted by HUD, as well as those conducted by the developer, reveal that the proposed site for SAR does not lie upon any major recharge point for the Edwards Aquifer. In fact, most estimates place the recharge occurring from the SAR property at 0.5% of the total annual 500,000 acre feet of recharge to the entire aquifer. The highest estimate this Court has heard was 1.0%. Only 13% of annual rainfall on

the SAR site ever reaches the aquifer. The other 87% is either consumed by vegetation, evaporated directly, or removed from the site as surface run-off. Notwithstanding such minimal recharge from the site, however, HUD has still seen fit to require that an elaborate water control and monitoring system be established by the developer. To design this system, detailed studies were made and independently reviewed to determine the present contents of the water in the aquifer. Then, an appropriate urban area was studied in order to better anticipate the quality of the urban water run-off after the completion of SAR. Finally, scientific projections were made to determine the effects of such urban run-off on the aquifer.

After the studies were completed, a complete system of control and monitoring was established, not only to maintain present water quality, but also to effectively monitor future water quality, so that corrective measures could be taken were it discovered that some pollution was seeping into the reservoir. Extensive measures have been set up to retard any pollution from seeping below the surface. First, there will be an extensive street sweeping program. It was estimated at the trial that through the use of modern vacuum sweepers approximately 90% of the contaminants which accumulate on the streets could be removed by this process, and that this reduction should make the urban street run-off comparable to the storm water run-off occurring on the site today. In addition to the street sweeping, six inches of top soil will be required to be spread on all lawns in SAR. This soil should serve to "leech out" approximately 99% of the pesticides and herbicides which will be used at SAR, especially since the deed restrictions will require that a urea-type fertilizer shall be the only type of fertilizer allowed on SAR. All solid wastes will be collected and removed from the recharge zone. There will also be regulations requiring the use of double tanks for any storage of petroleum products in the area, and the sewer pipes utilized will be of a very high quality, and unlike most anywhere else in the United States, be inspected for leaks after two years, and then again after five. Within the sensitive recharge area, no leakage will be permitted, as the pipe will be laid inside another concrete pipe. Outside the recharge area there will be a maximum test leakage rate allowable of 250 gallons per inch diameter per mile per day, which is to be contrasted with a 500 gallon leakage rate that was orginally recommended by the Texas Board of Health. Although it is not contemplated that the pipes will ever leak at the allowable rate, as the rate is determined under pressurized conditions and the system to be employed at SAR will be based upon gravitational pull, it should be noted that, even were the maximum leakage rate occurring (i. e., 200,000 gallons per day) it would only be equivalent to the waste produced by the 400 cattle currently grazing on the SAR site.

To insure that the controls are working, the developer will employ an elaborate water monitoring system. There will be a surface water monitoring system consisting of five permanent monitoring stations, two or three "grab sample" points, and two or three lawn sampling points. From this initial gathering, the quanity and quality of surface water will be determined as it is entering the limestone. The second level of water monitoring will consist of nine wells strategically placed on the upthrown side of the SAR site. The sampling of this well water will determine whether or not pollutants are getting by the initial controls. Finally, there will be three wells located just south of the Haby Crossing Fault which, due to their large draw-down cones, should sample most of the water entering the artesian section of the aquifer from SAR. This water monitoring system has been approved by the city engineer of San Antonio, the Texas Water Quality Board, the State Health Department, and the geologist retained by HUD.

■ Through the enforcement of the above mentioned controls, this Court finds that HUD has complied with the goal of NEPA, as stated in 42 U.S.C.A. § 4331, by "[using] all practicable means, consistent with other essential considerations of national policy" to carry out our nation's environmental policy. It surely cannot be said, in light of the above, that the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### III.   Applicability of the Water Pollution Act

■ On the seventh day of trial, Plaintiff-Intervenor Edwards Underground Water District (EUWD) was granted leave to file a trial amendment which added as·a cause of action the alleged violation by SAR of the Water Pollution Prevention and Control Act Amendments of 1972, 33 U.S.C.A. § 1251, et seq. In general, the amendment claims that the development of SAR will cause the pollution of navigable surface waters, as well as ground waters in the Edwards Reservoir. Although there has been no evidence introduced as to the presence of any navigable waters in the area of SAR, there is ground water at the site; therefore, EUWD's complaint must be considered. For the reasons that follow, this Court finds absolutely no merit to the claim that the development of SAR will violate any provision of the Water Pollution Control Act.

■ The purpose of the Act, as indicated by the legislative history, U.S.Code Cong. and Adm.News, 92d Cong., 2d Sess. at 3668–3834 (1972), is to establish the means whereby comprehensive programs for water pollution control may be developed and implemented by the Environmental Protection Agency. As stated in the history, Id. at 3758,

> The major purpose of this legislation is to establish a comprehensive long-range policy for the elimination of water pollution, making it clear to industry and municipalities alike the pollution control performance which

will be expected over the next decade. At the same time, the bill provides a mechanism for generating sound, detailed information on the costs which will be associated with the later stages of the control program, and allow subsequent Congresses to evaluate the success of the policy enunciated in this bill.

Under the bill, standards may be established for the maximum level of pollution allowable in interstate waters, and once the standards are set up, legal action may be taken to enforce them against the polluters. Id. at 3671. As no evidence was introduced at this trial indicating what standards, if any, have been established by the Environmental Protection Agency, this Court has nothing to enforce. It should be noted, however, that when the standards have been determined, they will be applicable to SAR, as HUD has required the developer to conform to *any* state or federal water standards which may be established.

If, however, this Court is mistaken in its conclusion that the Act is not presently applicable to SAR, it finds that the development will not discharge toxic pollutants in toxic amounts into the aquifer. One-half of one per cent is the recharge which may be attributable to the SAR site. Through the scheme of controls, none of the water reaching the aquifer region should be polluted. If, however, it is polluted, then the monitoring system which has been established should discover it, and afford ample opportunity to correct it. HUD has required the developer to maintain the *present* water quality in the aquifer. Thus, if the monitoring system discovers that pollution is seeping into the aquifer, it will be the duty of HUD to see to it that the seepage is stopped. This Court fails to see how any act of Congress could improve upon the standards already established by HUD for the protection of the aquifer.

### Conclusion

After hearing nine days of testimony and reviewing a stack of documents al-

most four feet high, this Court is of the firm belief that the development of the San Antonio Ranch new community should not be hindered as long as the controls which have been imposed by HUD are maintained. It is significant that the exacting restrictions placed upon SAR in this case constitute the only meaningful attempt thus far, on the part of *any* governmental agency, to control the use of land over the recharge zone of the Edwards Aquifer. Ideally, of course, it would be much more desirable if all residential and commercial development were prohibited over the entire recharge area, and the land converted into a closely supervised park or wildlife preserve. But unfortunately, there is a serious question whether adequate enabling legislation exists to authorize any governmental agency to effect the remedies needed to accomplish anything of a constructive nature in that regard. If the public could be assured that the remainder of the recharge zone in the northwest section of Bexar County, including that portion to be occupied by the University of Texas at San Antonio and its environs, would be subjected to controls similar to those governing San Antonio Ranch, there would be little or no occasion for the deep concern expressed by this Court during the trial, and shared by others, for the future purity of the aquifer. Actually, however, as already stated, the portion of the recharge area occupied by San Antonio Ranch constitutes only one-half of one percent to one percent of the total Edwards recharge zone. Unless something is done—and soon—by some responsible agency or agencies to eliminate the pollution in Medina Lake and the various streams presently flowing through the fourteen highly sensitive areas of recharge, it stands to reason that the Edwards Aquifer is doomed, regardless of what happens in the recharge area of San Antonio Ranch. The time for action, rather than words, has long since passed.

■ Although this lawsuit primarily involved only the portion of the recharge zone to be occupied by San Antonio Ranch, the fact remains that the future of the whole Edwards Underground Reservoir could be at stake, unless adequate controls are instituted for the entire recharge area. Under the circumstances, this Court believes, as have courts in other areas of the law, see, e. g., United States v. Hinds County School Board, 433 F.2d 611, 618–619 (5th Cir. 1970), that it should retain jurisdiction of this cause for such period of time as may be necessary to insure that the safeguards imposed upon the San Antonio Ranch developers by HUD are fully instituted and implemented; that the monitoring procedures adopted are followed meticulously; and that the reports reflecting the status and results of all procedures being utilized are made a matter of public record, as and when they are available. By the same token, and so that any urban sprawl attributable to the development of SAR in adjacent areas may be readily recognized and evaluated, this Court should be kept advised by the Texas Water Quality Board and the Edwards Underground Water District, on a continuing basis, of the status of any development taking place in the portion of the Edwards Aquifer recharge zone located in Bexar County, including, but not limited to, the San Antonio Ranch and the University of Texas at San Antonio, as well as the immediate and long-range effect of such development upon the recharge zone and the underground reservoir, indicating what measures, if any, are being instituted for the protection of the aquifer, and reflecting the status of any legislation, plans or proposals designed to protect the remaining portions of the recharge zone lying outside Bexar County, Texas.

Accordingly, it is Ordered that:

1. Judgment be entered in favor of defendants, HUD and SAN ANTONIO RANCH, LTD.

2. All relief prayed for by plaintiffs and plaintiff-intervenors be and is hereby denied. (See paragraph 5, infra.)

3. The defendant, SAN ANTONIO RANCH, LTD., shall file with this Court, the Texas Water Quality Board, the Edwards Underground Water District, the City of San Antonio, and Bexar County copies of all data and reports required to be supplied to HUD pursuant to the General Development Plan and the project agreement between San Antonio Ranch, Ltd. and HUD; and HUD shall, in turn, file with the Court, the Texas Water Quality Board, the Edwards Underground Water District, the City of San Antonio, and Bexar County copies of all comments thereon and responses thereto, including any and all suggestions, recommendations, and ultimatums that may be furnished to the developer by HUD.

It is further Ordered that, subject to the further orders of this Court, the Texas Water Quality Board and the Edwards Underground Water District, both of whom are parties to this lawsuit, shall, on or before July 1, 1973, and at intervals of not more than six months thereafter, file with this Court, as well as with the City of San Antonio and Bexar County reports reflecting the status of any development taking place in the portion of the Edwards Aquifer recharge zone located in Bexar County, including, but not limited to, the San Antonio Ranch and the University of Texas at San Antonio, as well as the immediate and long-range effect of such development upon the recharge zone and the underground reservoir, indicating what control measures, if any, are being instituted for the protection of the aquifer, and reflecting the status of any legislation, plans, or proposals designed to protect the remaining portions of the recharge zone lying outside Bexar County, Texas.

## MOTION TO AMEND JUDGMENT

██ Consideration has been given to the motion of James T. Lynn, Secretary of Housing and Urban Development, to alter or amend judgment, in which he complains of this Court's action in retaining jurisdiction over this suit and requiring HUD to file copies of comments and responses relating to the filings made by San Antonio Ranch, Ltd. This Court, however, feeling that full compliance with the National Environmental Policy Act of 1969, 42 U.S.C.A. § 4321, is of vital importance to the citizens of this area, and believing that it has full authority to retain jurisdiction for the purposes indicated, is of the opinion that the motion should be denied. See Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 21, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); United States v. Hinds County School Bd., 433 F.2d 611, 618–619 (5th Cir. 1970); Holland v. Bd. of Public Instruction, 465 F.2d 370. (5th Cir. 1972).

It is patently obvious that great inconvenience and extreme hardship would be imposed upon the public generally, and upon the agencies involved in this suit, if they were required to individually obtain from HUD the many proposed studies alluded to in the General Development Plan and the Project Agreement, in order to assure themselves that the developer was indeed living up to what it promised to do. As a consequence, it is highly appropriate for this Court to act as a central depository to receive all pertinent material available with respect to any development in the recharge zone of the Edwards Aquifer. In this connection, it is gratifying to note that the developer, San Antonio Ranch, Ltd., as well as the Texas Water Quality Board and the Edwards Underground Water District, have indicated their willingness to comply with the Court's requirements. Since federal funds are involved, and HUD is a public agency that has voluntarily assumed the obligation to make certain that San Antonio Ranch, Ltd. develops its property over the recharge zone pursuant to law, it should be willing to do no less.

The motion to alter or amend judgment is, in all things, denied.

## ORDER GRANTING ATTORNEYS' FEES

This Court has considered the citizen plaintiffs' brief in Support of Attorneys' Fees filed pursuant to this Court's prior Judgment and Order, wherein it was stated,

This Court is firmly convinced that even though the plaintiffs may have, at this stage, technically lost this lawsuit, nevertheless, a very important service has been performed in creating a greater public awareness of the dangers of pollution threatening this very valuable natural resource [*i. e.,* the Edwards Underground Reservoir]. Therefore, if it is appropriate under the law to award attorneys' fees to certain of counsel for plaintiffs in order to compensate them for their services rendered herein, consideration will be given to doing so. Each attorney for plaintiffs is directed to furnish to this Court and opposing counsel, within ten days from this date, a brief setting forth his position in this regard . . . . Defendants shall have ten days thereafter in which to respond.

Having reviewed the facts of this case and the briefs filed, as well as the authorities cited therein, this Court is now of the belief that attorneys' fees should be awarded to counsel for the citizen plaintiffs and paid by the defendant San Antonio Ranch, Ltd.

Defendant San Antonio Ranch, Ltd. (SAR) argues strenuously that "it is highly questionable whether this Court has the power to impose upon a prevailing adverse party the burden of reimbursing plaintiffs' attorneys' fees . . . .". It is SAR's position that, unless the award is provided for by either statute or contract, or unless the circumstances of the case indicate the presence of one of the three "well established exceptions to the American rule" of generally denying attorneys' fees, the award may not be made. This Court is in disagreement with such a · hard-and-fast approach.

The three exceptions to the general rule that attorneys' fees are not ordinarily recoverable have been stated recently in La Raza Unida v. Volpe, 57 F. R.D. 94, 96 (N.D.Cal.1972). The first is the "obdurate behaviour" situation wherein the plaintiff is awarded fees because the defendant has been acting in bad faith. See Vaughan v. Atkinson, 369 U.S. 527, 530–531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). The second general exception is the "common fund" situation which ensures that all beneficiaries to the litigation share in its expense. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Finally, there is the "private attorneys general" situation under which plaintiffs are compensated for ensuring the effectuation of a strong Congressional policy. See Lee v. Southern Home Sites Corp., 429 F.2d 290 (5th Cir. 1970). However, this Court does not believe that a slight deviation from one of the established elements of any of the exceptions would, *ipso facto*, deprive the plaintiffs of an award should the trial court decide that equity dictates the award. The Supreme Court appears to be in complete agreement with this reasoning. As Mr. Justice Brennan recently stated for the Court in Hall v. Cole, 412 U.S. 4–5, 93 S.Ct. 1943, 1945, 36 L.Ed.2d 702 (1973).

Although the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require. Indeed, the power to award such fees "is part of the original authority of the chancellor to do equity in a particular situation," Sprague v. Ticonic National Bank, 307 U.S. 161, 166 [59 S.Ct. 777, 83 L.Ed. 1184] (1939), and federal courts do not hesitate to exercise this inherent equitable power whenever "overriding considerations indicate the need for such a recovery." Mills v. Electric

Auto-Lite Co., 396 U.S. 375, 391–392 [90 S.Ct. 616, 24 L.Ed.2d 593] (1970); see Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718 [87 S.Ct. 1404, 18 L.Ed.2d 475] (1967).

After reviewing the facts here, this Court is of the belief that the position of the citizen plaintiffs is analogous to that of a plaintiff in a civil rights suit, wherein it has been concluded that attorneys' fees should be awarded unless the trial court can articulate specific reasons for a denial. See Cooper v. Allen, 467 F.2d 836, 841 (5th Cir. 1972); Lee v. Southern Home Sites Corp., 429 F.2d 290, 295 (5th Cir. 1970). In *Lee*, Judge Coleman stated,

> There is ample authority, outside the civil rights area, to support the proposition that the allowance of attorneys' fees and expenses of preparation for trial is in the discretion of the district court *sitting in equity* where exceptional circumstances call for their allowance in order to do justice between the parties, . . . as well as in the more traditional situations where the allowance of attorneys' fees is provided for by statute or contract. . . . In the area of civil rights, many cases have either allowed or implicitly recognized the discretionary power of a district judge to award attorneys' fees in a proper case in the absence of express statutory provision . . . and especially so when one considers that much of the elimination of unlawful racial discrimination necessarily devolves upon private litigants and their attorneys, . . . and the general problems of representation in civil rights cases.

429 F.2d at 295 [citations omitted].

As in the civil rights area, the burden of assuring full compliance with the national environmental policy, as expressed by Congress through the National Environmental Policy Act of 1969, 42 U.S.C.A. § 4321 et seq., has fallen upon concerned citizens. The mere fact that there is no provision in the statute for the awarding of attorneys' fees will not be viewed as a bar to such an award. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 390–391, 90 S.Ct. 616, 24 L.Ed. 2d 593 (1970).

In this case, not only can no specific and justifiable reasons be articulated for the denial of attorneys' fees, but this Court is of the firm belief that equity dictates the award. At the commencement of this suit on February 23, 1972, comparatively little of the information subsequently made public had been made available to the general citizenry. Although the "Final Environmental Statement" was circulated for public comment on January 20, 1972, and HUD's offer of commitment was made on February 23, 1972 (the same day suit was filed), this Court, in its Order To Hold Case In Abeyance of March 14, 1972, saw fit to state as point No. 7,

> In view of the fact that defendants agree that the existing "Final Environmental Impact Statement" is not in truth and in fact a "final" statement as contemplated by law, and that additional information required by law needs to be furnished, there is no necessity for this Court to order that the existing statement be withdrawn, but only to require that any environmental impact statement ultimately relied upon satisfies the requirement of finality as used in the legal sense.

Over the months that followed, many studies and hearings were conducted which inquired into the feasibility of the SAR Project, and what, if any, adverse effects it might have upon the Edwards Underground Reservoir. It was during this period that Dr. Henry V. Beck's "Evaluation of Water Quality Studies on San Antonio Ranch, New Town," a report relied upon heavily by the defendants,[y] was published, and the studies on storm water runoff conducted by Dr. W. H. Espey, Jr. were performed. In addition, the four meetings of the San Antonia Ranch Water Quality Advisory Review Board were held during the summer of 1972. In light of the reams of material published after this Court's Order of March 14th, it is difficult to

conclude that the filing of the suit did not help to ensure that adequate precautions would be taken to protect South Texas' very valuable water resource and that the measures taken would be made available to the scrutiny of the public eye.

Finally, although this Court would like to spread the cost of the award equally between San Antonio Ranch, Ltd., and HUD, it finds that by Congressional mandate it is prohibited from doing so. See 28 U.S.C.A. § 2412.

It is therefore hereby ordered that the citizen plaintiffs recover reasonable attorneys' fees from the defendant San Antonio Ranch, Ltd., the amount of such award to be determined at a hearing to be held on a date to be set after conferring with counsel.

Bexar County and the Edwards Underground Water District have waived any right to claim attorneys' fees, and the Court finds that no attorneys' fees are recoverable against the defendant James T. Lynn, Secretary of Housing and Urban Development.

### ON MOTION FOR RECONSIDERATION

On the 21st day of August, 1973, came on to be considered defendant San Antonio Ranch, Ltd.'s motion for reconsideration of the Court's order approving the award of attorneys' fees, the motion of citizen plaintiffs for continuation or restoration of injunction during the pendency of appeal, and motions by both the citizen plaintiffs and the United States Department of Housing and Urban Development to tax expenses of certain witnesses as costs of court. Having reviewed the facts of this case, in addition to the briefs and affidavits filed, and authorities cited, this Court

is of the opinion and finds that attorneys' fees, costs and expenses should be awarded to citizen plaintiffs in the total amount of $20,000.00; that the motion for injunction during the pendency of appeal should be denied; and that the motions filed by plaintiffs and HUD seeking to tax costs relating to the travel, subsistence, attendance, or other expenses of certain witnesses should be denied.

### A. Attorneys' Fees

Defendant San Antonio Ranch, Ltd. (SAR) insists that attorneys' fees can only be awarded to a successful litigant. Though the judgment entered in this cause clearly and unequivocally denied all relief sought by the plaintiffs, it does not necessarily constitute the sole basis for determining the success or failure of plaintiffs in bringing this lawsuit.[1] As noted in this Court's order of June 28, 1973, the "final" Environmental Impact Statement filed by HUD on January 23, 1972, did not, in truth and in fact, fully comply with the law, though by the time this litigation was completed such compliance had been achieved through further extensive study, research, public discussion, and planning on the part of HUD, as well as many other governmental agencies and private parties. In addition to the public meetings held by the Water Quality Advisory Review Board, composed of 18 public agencies, which resulted in that Board's approval of the project (an action that should have been taken before HUD made its final commitment), the study made by Dr. Henry V. Beck ("Evaluation of Water Quality Studies on San Antonio Ranch, New Town") was published, as was the study on storm water runoff conducted by Dr. W. H. Espey, Jr. All of these very important events took place subsequent to the filing of

---

1. See Globus, Inc., v. Jaroff, 279 F.Supp. 807 (S.D.N.Y.1968), where in a stockholders' derivative action based upon misleading use of a proxy statement concerning a stock option, cancellation of the stock option before completion of the suit made the case moot, and yet in the face of the result which plaintiff requested having been accomplished prior to judgment, his claim for attorneys' fees was still considered.

Several recent articles have examined the awarding of attorneys' fees in environmental litigation. *See, e. g.,* Nussbaum, Attorney's Fees in Public Interest Litigation, 48 N.Y. U.L.Rev. 301 (1973); Note, Awarding Attorney and Expert Witness Fees in Environmental Litigation, 58 Cornell L.Rev. 1222 (1973).

this lawsuit. It is almost axiomatic that vital reports concerning the safety of the proposed project could not be evaluated fully by all governmental agencies involved, as contemplated by the NEPA, until they were completed and circulated. As a consequence, from the time the injunction in this case was originally filed to the time the trial was completed, the facts and record had changed so substantially as to make this an entirely different lawsuit. And it should be noted that the direct holding of this Court in its Memorandum Opinion of July 17, 1973 was "that the addendum to the Final Environmental Impact Statement, issued August 24, 1972, meets all the requirements for the 'detailed statement' required by NEPA, 42 U.S.C.A. § 4332 (C)." The addendum, which included 77 exhibits, amounting to over a foot and a half of papers, was a document far different from the first "final" Environmental Impact Statement. Essentially, the plaintiffs forced heretofore untested hypotheses to be subjected to rigorous study which did in fact reveal the project to be safe, forcing both the government and SAR to do what they should have done of their own initiative in the first place, before the Final Environmental Impact Statement was issued, and turning a preliminary hypothesis as to safety into a much more logical and reasonable conclusion. Prior to the filing of the lawsuit there was no firm assurance that all of the studies eventually done would be done, even under the moratorium imposed by HUD as a condition of their grant.

Defendant SAR maintains that Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), specifically allows only two exceptions to the general American rule denying attorneys' fees under the Court's equitable powers: 1) when an opponent has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons;" and 2) cases in which substantial benefits have been conferred upon members of an ascertainable class, where the court's jurisdiction makes possible an award to spread the costs proportionately among the members of the class. This Court does not agree with that interpretation. Nowhere in Hall v. Cole does the Court limit the inherent equitable power of the federal courts to award attorneys' fees (specifically noted in the decision) to those situations exclusively. A careful reading of Hall v. Cole would seem to support the conclusion of one observer following the decision in Mills v. Electric Auto-Lite:

Where previously the courts were led to start with the traditional rule and then ascertain whether the case fell into one of the three *Fleischmann*-approved exceptions, now they are to start with the equitable power of the courts to grant appropriate remedies with the burden on the other side to prove a legislative "purpose to circumscribe the courts' power." 38 Chi.L. Rev. 316 (1971) at 325.

Moreover, in the recent case of Ojeda v. Hackney, 452 F.2d 947 (1972), the Fifth Circuit stated:

In sum, the equitable propriety of the allowance of any amount of attorneys' fees, and the manner in which those fees, if allowed, are to be collected, is committed entirely to that court's sound discretion . . . (At 948)

Thus even if the judgment in the above entitled case were read as totally unfavorable to the plaintiffs, and resulted in none of the relief which they originally sought, it would still remain within the inherent equitable power of the Court to award attorneys' fees if so prompted by "overriding considerations" indicating the need for such a recovery. Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702.

In the instant case these overriding considerations consist of the public service rendered by the plaintiffs, who through this litigation have helped ensure the purity and continued viability of the water in the Edwards Underground Aquifer. Attorneys' fees have been granted many times in the well recognized instances in which plaintiffs have served as "private attorneys general," and are thereafter compensated because their efforts have served the public interest by ensuring the effectuation of a strong Congressional policy. Lee v.

Southern Home Sites Corp., 429 F.2d 290 (5th Cir. 1970). The same holds true in civil rights cases. See Cooper v. Allen, 467 F.2d 836, 841 (5th Cir. 1972). There is no reason why the protection of the public interest in this environmental case should be treated any differently.

The attorney for citizen plaintiffs in the instant case indicated in his affidavit that over 1,185 hours were spent in preparation and trial of this litigation, and all parties stipulated that the time sheets submitted in such affidavit were correct. In this connection, the Court finds that during the period from approximately February, 1972 until October, 1972, the attorney for citizen plaintiffs devoted 210 hours of the time set forth in the affidavit to his representation of Bexar County, a plaintiff which did not request and was not granted attorneys' fees in this Court's order of June 28, 1973. Accordingly, the time spent on behalf of Bexar County will not be considered as a basis for compensation.

The award of attorneys' fees is not intended to make either the client or the attorney whole, nor by any means fully compensate counsel for the time expended in this extended and complex litigation which has stretched out over a period of a year and a half. The Court does not feel that the minimum fee schedule of the State Bar of Texas may be used as a proper basis for measuring the rate of compensation to be awarded in a case such as this. Nor does the Court find that the fee a practicing attorney would charge a private client, willing and able to pay, to be appropriate in this case. Rather, considering the Criminal Justice Act, and the purposes of that Act, the Court finds that the statutorily enumerated rate of compensation set out in 18 U.S.C. § 3006A(d) (1972), is a reasonable guide for setting compensation in public interest civil litigation. That section provides for compensation at the rate of $30 an hour for time spent in court, and $20 an hour for out-of-court time. As noted by District Judge Frank Johnson: "It is the duty of members of the legal profession to represent clients who are unable to pay for counsel and also to bring suits in the public interest." Wyatt v. Stickney, 344 F.Supp. 387, 410 (M.D.Ala.1972). The rates set out by the CJA provide neither unjust enrichment nor undue impoverishment of counsel who commendably bear a large share of the public responsibility of the legal profession.

Having considered the Criminal Justice Act, the approximate number of hours expended in this litigation, plus the complexity and novelty of this case, the skill and outstanding service performed by the opposing counsel, the importance and beneficial result of this litigation to the public, expenses paid by plaintiffs totalling $2,620.79, costs incurred in securing witnesses, and all the facts and circumstances of the case, this Court finds that $20,000.00 is a fair and reasonable amount to cover the fees, costs and expenses incurred by plaintiffs.

### B. Motions to Tax Costs

The Department of Housing and Urban Development requests that certain costs be taxed against citizen plaintiffs, and the citizen plaintiffs request that certain other costs be taxed against the defendants. These motions are made pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 1821 and 1920.

### (1) Motion by Plaintiffs—

Plaintiffs have asked for a total award of costs in the sum of $968.40 to cover travel and other expenses of certain witnesses. However, in light of the award of $20,000.00 herein made to cover their fees and expenses, plaintiffs' motion should be and the same is hereby denied.

### (2) Motion by HUD—

The Department of Housing and Urban Development has requested total fees for travel, subsistence, and attendance of $1,889.60. The Court does not dispute any of the specific costs

claimed by defendant, but since, as already indicated, the award of attorneys' fees would have been spread equally between San Antonio Ranch, Ltd., and HUD, if it were not for the prohibition of 28 U.S.C. § 2414, this Court is of the opinion that it is appropriate under the provisions of Rule 54, Federal Rules of Civil Procedure to deny such costs to HUD.

C. Motion for Continuation or Restoration of Injunction During the Pendency of Appeal

█ Plaintiffs have alleged in their motion for continuation or restoration of injunction during the pendency of appeal that, absent such an injunction, irreparable damage will be done to the surface cover of the Edwards Underground Aquifer, and that irrevocable financial commitments will be made by HUD and private investors. The allegation of irreparable injury is only one of the four conditions necessary to justify the issuance of an injunction pending appeal. Other requirements are that a party seeking such an injunction must make a strong showing that he is likely to succeed on the merits of the appeal, that no substantial harm will result to the other parties due to the injunction, and that the injunction will serve the public interest. Blackshear Residents Organization v. Romney, 472 F.2d 1197 (5th Cir. 1973); Beverly v. United States, 468 F.2d 732 (5th Cir. 1972); Fortune v. Molpus, 431 F.2d 799 (5th Cir. 1970); Pitcher v. Laird, 415 F.2d 743 (5th Cir. 1969); Belcher v. Birmingham Trust National Bank, 395 F.2d 685 (5th Cir. 1968).

█ Not only have the plaintiffs failed to demonstrate that irreparable damage will result if the injunctive relief is not continued, but this Court does not believe that the record in this case would support a finding that there is a strong likelihood that plaintiffs will succeed in an appeal on the merits. Certainly, it would be the height of inconsistency for this Court to determine after a nine day trial that no irreparable damage to the aquifer will result if the project proceeds, and then enjoin the project because irreparable damage will result if the project is not halted. An injunction in the present case would, in practical effect, award to plaintiffs the identical relief already denied to them on the merits of the case.

█ However, the Court is of the firm opinion that the lifting of the injunction against further construction should not prejudice the position of either party, nor change the present status of this litigation to the disadvantage of any party. Therefore, it is specifically noted that any future construction, financial or contractual commitments, or progress of any kind or character on the SAR project shall be undertaken at the defendants' own peril. In other words, the denial of plaintiffs' motion for continuation or restoration of the injunction during the pendency of appeal is conditioned upon the premise that no evidence shall be offered, received, or considered at any future proceeding in this cause concerning any development of the project subsequent to this date, whether for the purpose of establishing grounds for equitable relief or otherwise; it being the intention of the Court that any evidence which may be presented at any future hearings or proceedings herein shall be limited to the stage of development of the project as of March 14, 1972, the date of entry of the original injunction in this case.

It is therefore ordered that:

(1) The motion for continuation or restoration of injunction during pendency of appeal is hereby denied, subject to the condition hereinabove set forth.

(2) Attorneys' fees, costs, and expenses shall be awarded to the citizen plaintiffs in the total amount of $20,000.00, to be paid by defendant, San Antonio Ranch, Ltd.

(3) The motions by plaintiffs and HUD to tax costs relating to the travel, subsistence, attendance, or other expenses of certain witnesses are denied.