502 F.2d 43
 7 ERC 1033, 4 Envtl. L. Rep. 20,844
 SIERRA CLUB et al., Plaintiffs-Appellants-Cross Appellees,
Edwards Underground Water District et al.,
Intervenors-Appellants-Cross Appellees,
v.
James T. LYNN, Secretary of the U.S. Department of Housing
and UrbanDevelopment, et al., Defendants-Appellees-Cross
Appellants, San Antonio Ranch,Ltd., Defendant-Appellee-Cross
Appellant, Texas Water Quality Control, Intervenor.
 No. 73-3378.
 United States Court of Appeals, Fifth Circuit.
 Oct. 4, 1974, Rehearing and Rehearing En Banc Denied Nov. 19, 1974.
 
 George P. Parker, Jr., Jon C. Wood, Ferd C. Meyers, Jr., San Antonio, Tex., for Edwards Underground Water Dist.
 Keith W. Burris, San Antonio, Tex., Bruce J. Terris, Washington, D.C., for Bexar County.
 Phillip D. Hardberger, San Antonio, Tex., for Sierra Club and others.
 Hugh P. Shovlin, Asst. U.S. Atty., William S. Sessions, U.S. Atty., San Antonio, Tex., for J. T. Lynn, and others.
 Seagal V. Wheatley, San Antonio, Tex., (Carl R. Teague, Oppenheimer, Rosenberg, Kelleher & Wheatley, Inc., San Antonio, Texas, on the brief), for San Antonio Ranch, Ltd.
 M. Lynn Taylor, Asst. Atty. Gen. of Tex., Environmental Prot. Div., Jerry Hill, Austin, Tex., for Tex. Water Quality.
 Before WISDOM and CLARK, Circuit Judges, and GROOMS, District Judge.
 CLARK, Circuit Judge:
 
 
 1
 An offer of commitment by the United States Department of Housing and Urban Development (HUD) to guarantee an 18 million dollar private bond issue for the development of San Antonio Ranch New Town (Ranch) spawned this environmentalist litigation against defendants James T. Lynn, Secretary of HUD, and San Antonio Ranch, Ltd., the developer. Charging violations of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 et seq., and the Urban Growth and New Community Development Act of 1970 (Title VII), 42 U.S.C. 4501 et seq., four citizens groups (the Sierra Club, Citizens for a Better Environment, League of Women Voters of the San Antonio Area, and American Association of University Women, San Antonio Branch) and their individual members, as plaintiffs, sought declaratory and injunctive relief barring defendants from issuing or accepting either the bond guarantee or any other federal assistance supporting development of the Ranch until the proposed project complied with NEPA and Title VII. Thereafter, the district court permitted the Texas Water Quality Board to intervene on behalf of the defendants, and the Edwards Underground Water District, which had intervened a long with Bexar County, Texas on behalf of the plaintiffs, amended its original complaint to allege that development of the Ranch also contravened the Water Pollution Prevention and Control Act Amendments of 1972, 33 U.S.C. 1251 et seq.
 
 
 2
 Depending upon which party's view is accepted, the Ranch will be either an urban planner's utopia incarnate or an environmental disaster of the first magnitude. As conceived by the developer, a limited partnership composed of individuals experienced in real estate, construction, financing and new town management, the Ranch will convert 9,318 acres of predominantly virgin Texas hill country land in the northwest quadrant of Bexar County, Texas into a 'free standing' new community of 87,972 residents living in 28,676 housing units (41%-- single family detached houses, 6%-- townhouses, 45%-- medium density apartments, and 8%-- high density apartments), of which one-fourth will accommodate low and moderate income families, through staged construction over a 30-year period. The Ranch site, which is presently virtually undisturbed and primarily used for ranching, grazing and occasional hunting, is dominated topographically (85%) by hill country and rocky soil characterized by 100 to 200 ft. differentials in elevation. The southern 1200 acres (15%) consists mainly of flat terrain and agriculturally productive soil. An expanding network of regional highways serving the area will be supplemented by an external mass transit system connecting the Ranch to downtown San Antonio, approximately 20 miles away, the South Texas Medical Center, a distance of 10 miles, the University of Texas at San Antonio, a 6-mile trip, and the San Antonio International Airport, currently a 25-minute drive. The developer will contract for essential municipal services and public utilities with the City of San Antonio, whose City Council has adopted a resolution favoring eventual annexation of the entire project.
 
 
 3
 More than half of the Ranch acreage will be devoted to residential development and internal roads. The project contemplates over 2200 acres of open space, which includes a 2,000 acre greenway system, two 18-hole golf courses, three recreational use lakes, neighborhood recreation centers with swimming pools and tennis courts and a continuous hiking and bicycle trail system. 12,750 employees are expected to work in two industrial and research and development parks totaling 1,234 acres. A 500 acre vocational training and technical center, featuring public or private affiliated educational and training facilities, will staff 430 employees, and it is estimated that 4,480 persons in public jobs will service the Ranch population. Of the 180 acres set aside for commercial use, 150 acres will be devoted to a town center that will act as the gateway to the entire Ranch, providing the focus of civic, entertainment, office employment and shopping activities. Two educational parks and 13 elementary schools sites will cover 330 acres. In general the land use plan seeks to take maximum advantage of the area's variation in topography by clustering common or public facilities along an 'activity belt,' a major right-of-way loop that envelopes the community and laces its components together. The center of the Ranch forms a residential island and the network of canyons affords the basis for a continuous green belt system that will permit a person to bicycle or walk or horseback ride from the town center to any point within the ranch without crossing a major throughfare.
 
 
 4
 The spectre of environmental doom is raised by the fact that the proposed development lies astride a portion of the zone of land which takes surface waters to the Edwards Aquifer, an underground water bearing formation that is the sole water supply for the City of San Antonio and 1,000,000 area residents. The aquifer region has been estimated to be approximately 175 miles in length with a varying width of 5 to 45 miles, encompassing a crescent-shaped surface area of 3 1/2 million acres that extends over more than 7 counties. Ground water flows freely (in terms of miles per day) in an esterly direction through the Edwards formation of extremely permeable limestone, which averages 500 feet in thickness, until it is cut by the Balcones fault system. Northwest of the fault the surface limestone is upthrown to form the Edwards Plateau. In this region, honeycombed with fissures and cracks, ground water percolates through the stratum and is found under normal, unconfined water-table conditions. Southeast of the fault line, however, the limestone formation is downthrown, sloping from a surface recharge area near the fault line south and east hundreds of feet below the surface, and overlaid with less permeable and younger rocks, which confine the ground water in the underground reservoir from which San Antonio draws its water supply.
 
 
 5
 The artesian reservoir is replenished annually with approximately 500,000 acre feet of water from three major sources. Most of the recharge is attributable to 14 surface streams on the Edwards Plateau that flow across fractures and joints in the fault zone, through which water filters down to the aquifer. This recharge zone varies in width from 1/2 to several miles and extends 80 or more miles above the Balcones fault system. It consists of many small pores and fissures inlaid among less permeable material. The second major source is underflow from one area of the reservoir that recharges another. Least significant is the recharge produced from rain falling directly on the exposed 'outcrops' of limestone in the upthrown region. This precipitation seeps through honeycombed passages and eventually filters its way into the reservoir.
 
 
 6
 Plaintiffs contend that if water entering the recharge zone is polluted, the entire aquifer will become contaminated. The Balcones Fault dissects the Ranch site latitudinally at the Haby Crossing Fault. Only about 13% Of the annual rainfall on the site is eventually introduced to the underground reservoir. The rest is consumed by vegetation, evaporated or removed as surface run-off. Since none of the 14 major stream beds or recharge areas is located on the Ranch, the recharge emanating from the Ranch is generally estimated at only one-half of one percent of the total annual recharge to the aquifer.
 
 
 7
 The Ranch moved from the drawing board to the bureaucracy when the developer approached HUD in February of 1970 to explore the possibilities of federal assistance under Title VII. Marketing studies had shown that the development envisioned by the preliminary master plan would capture 15% Of Bexar County's projected growth. During the prior decade almost half of the county's total population increase (143,000) had occurred in the northwest quadrant, whose influx of residents was expected to continue. Favorably impressed with the planning studies and pre-application proposal, HUD invited the developer to submit a formal application. Eight months later HUD's Office of New Community Development received the formal application and fee of 5,000 dollars and undertook a full agency review of the project.
 
 
 8
 Early concern for the integrity of the aquifer surfaced in many quarters. At HUD's suggestion the developer retained a geologist-hydrologist, Dr. L. J. Truk, to examine the project. A review of the Ranch was conducted by the Alamo Area Council of Governments, a regional multi-governmental planning organization composed of 16 representatives from the Edwards Water District, Bexar County and the 11 surrounding counties, which endorsed the project subject to two subsequently adopted conditions: (1) that HUD require thorough environmental impact studies, particularly as to the effect of storm water run-off; and (2) that the sanitary sewer system of the Ranch be connected and treated off the site by the City of San Antonio's regional waste water system. The Texas Water Quality Board and San Antonio city officials were informed of and commented upon the environmental hazards to the aquifer and the steps being taken to protect it. A team of HUD New Community Development staff members, including a civil engineer, a lawyer, an economist, an urban planner, a financial expert and an architect, was formed to prepare an environmental impact statement. The internal agency review of the Ranch's application culminated in a favorable Title VII critique of the project by the Assistant HUD Secretary for Community Planning Development, who submitted his report to the Board of Directors of HUD's Community Development Corporation in August of 1971 before the draft impact statement was circulated for public comment on September 13.
 
 
 9
 Of 13 public agencies solicited, 7 submitted written comments that were incorporated with comments volunteered by 9 other agencies or groups, including some of the plaintiffs, into the 'final' impact statement issued on January 20, 1972 for further circulation and public comment.[1] Just over one month later, on February 23, 1972, convinced that the Ranch was eligible under the Act for a federal financing guarantee of up to 18 million dollars, HUD proffered an offer of commitment that was contingent upon, inter alia, the developer's agreement to (1) a moratorium prohibiting development over the recharge zone of the aquifer until completion of a comprehensive environmental study of the recharge zone by the developer and until approval by the HUD Community Development Board and the Texas Water Quality Board of the measures proposed to protect the natural conditions disclosed by the study, (2) review and comment thereon by a public and interagency board organized to the satisfaction of HUD, and (3) the adoption of treatment methods and other continuing measures such as the monitoring of water quality, required by the Community Development Board and the Texas Water Quality Board.
 
 
 10
 On the same date plaintiffs filed their complaint in this action and sought a temporary restraining order. Without reaching the merits, the district court granted defendants' motion to hold the case in abeyance until the developer had satisfied the conditions in the offer of agreement with HUD. Subsequently, agreement will HUD. Subsequently, HUD formed the San Antonio Water Quality Advisory Review Board, composed of representatives from 18 public agencies and Bexar County, which conducted four separate public meetings and examined the impact of the project on the aquifer. This group inspected four reports submitted by Dr. Turk and the developer's other experts concerning continued studies of storm water and ground water quality at the Ranch, geological mapping of the site and soil renovation of storm water. It also surveyed the developer's plans for sanitary sewage collection and treatment facilities; transportation and storage of dangerous liquids; solid waste storage, collection and disposal; storm water controls; water quality monitoring system; and the legal controls supporting the inspection and enforcement of environmental quality programs.
 
 
 11
 In addition, HUD retained Dr. Henry V. Beck, a Kansas State University geologist, who, assisted by associates with expertise in environmental health engineering, hydrology and soil mechanics, independently reviewed the environmental studies and aspects of the entire project. Citations of approval of the Ranch by the advisory board and Dr. Beck and their recommendations for improving environmental controls over the aquifer and the water quality monitoring system were forwarded to HUD for consideration and inclusion with additional ecological and the underlying scientific studies in an addendum to the 'final' impact statement, which was circulated on August 24, 1972 among 38 public agencies or groups for additional study and comment. The Alamo Area Council of Governments, the San Antonio City Council, Water and Public Service Boards, the Texas Water Quality Board, the Governor's office and the State Department of Health approved the project as environmentally sound and consistent with regional land use planning. In October HUD concluded that the developer had satisfied each of the conditions contained in the letter of commitment and proceeded to commence negotiations leading to a project agreement.
 
 
 12
 After lengthy pre-trial maneuvering and assimilation of 9 days and 1920 pages of trial testimony, which generated voluminous exhibits, including a seven volume administrative record and three impact statements, the district court denied the relief sought by plaintiffs and entered judgment for the defendants, concluding that HUD had complied with the provisions of each federal statute. Furthermore, the court resolved to retain jurisdiction over the lawsuit for so long as might be necessary to ensure that the proposed environmental safeguards are fully instituted and implemented, and to require the parties to file with the court copies of all data and reports relating to the Ranch and other developments in the surrounding area. Finally, counsel for the plaintiffs were awarded 20,000 dollars in attorneys' fees, costs and expenses to be paid by the defendatnt developer. Sierra Club v. Lynn, 364 F.Supp. 834 (W.D.Tex.1973).
 
 
 13
 Plaintiffs appeal from the decision on the merits for defendants, renewing each of their statutory contentions, and asserting that the court improperly saddled them with the burden of proof. They also appeal from the amount of the attorneys' fees award. The developer cross-appeals from the grant of such fees against it, and Secretary Lynn cross-appeals from the district court's determination to retain jurisdiction. For the reasons that follow, we affirm the decision of the court below on the merits, and reverse its award of attorneys' fees and its retention of jurisdiction.
 
 
 14
 The district court correctly ruled that it was vested with jurisdiction under 28 U.S.C. 1331(a) and that plaintiffs possessed standing, see Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). It also properly concluded that judicial review of the Secretary's substantive Title VII decision to guarantee financing for initial development of the Ranch project is governed by the Administrative Procedure Act (APA),5 U.S.C. 701, et seq. Since neither Title VII nor the APA requires the agency to conduct a hearing or make formal findings when passing on new community applications, the appropriate standard of review is whether the Secretary's action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. 706(2)(a); see Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Under this standard the appellate court must determine whether the agency considered all relevant factors in reaching its decision, or whether the decision itself represents a clear error in judgment.
 
 
 15
 Where NEPA is involved, the reviewing court must first determine if the agency reached its decision after a full, good faith consideration and balancing of environmental factors. The court must then determine, according to the standards set forth in 101(b) and 102(1) of the Act, whether 'the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values.' Calvert Cliffs' Coordinating Committee v. U.S. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).
 
 
 16
 Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289, 300 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). 'Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).
 
 
 17
 In a motion to the trial court plaintiffs asserted that 'once a prima facie showing has been made that the federal agency has failed to adhere to the requirements of NEPA, the burden must, as a general rule, be laid upon this same agency which has the labor and public resources to make the proper environmental assessment and support it by a preponderance of the evidence contained in the impact statement.' Sierra Club v. Froehlke, 359 F.Supp. 1289, 1335 (S.D.Tex.1973), reversed sub nom., Sierra Club v. Callaway, 499 F.2d 982 (5th Cir. 1974). Without formally responding, the district court apparently applied the standard burden of proof-- plaintiffs were required to establish their claims by a preponderance of the evidence without any tactical shifting of that burden. Since none of the facts necessary to sustain plaintiffs' attacks on HUD's compliance with the applicable federal statutes were unavailable to the plaintiffs or within the exclusive possession of or undisclosed by the agency, the district court properly imposed the standard evidentiary burden on plaintiffs as to each of their claims. Sierra Club v. Callaway, 499 F.2d 982, 992, (5th Cir. 1974); see Environmental Defense Fund, Inc. v. Corps of Engineers, 492 F.2d 1123 (5th Cir. 1974).
 
 I.
 
 18
 The Urban Growth and New Community Development Act
 
 
 19
 Increasing concern over the deterioration of urban life led Congress to enact The Urban Growth and New Community Development Act as Title VII of the Housing and Urban Development Act of 1970, Pub.L.No. 91-609, 84 Stat. 1791, expanding a similar program that was authorized by the Housing and Urban Development Act of 1968, see 42 U.S.C. 3901 et seq. Over the last century the increasingly mobile quality of life in America has produced a pattern of population redistribution in which the migration of persons from rural areas to a small number of densely populated, congested central cities is followed by the flight of middle and higher income families and businesses from these urban centers to the suburbs. This pattern of movement has resulted in a polarization of the residents of city and suburbia by income, race, education, social philosophy and life style.
 
 
 20
 In order to treat the source rather than the symptoms of such social, economic and environmental problems, Title VII was designed (1) 'to provide for the development of a national urban growth policy,' 42 U.S.C. 4501-4503, and (2) 'to encourage the rational, orderly, efficient, and economic growth, development, and redevelopment of our States, metropolitan areas, . . . and communities in predominantly rural areas . . . (and) the prudent use and conservation of our natural resources by assisting public and private efforts in the development of well-planned, comprehensive new communities that will contribute to better enviroments, produce improve living conditions, add to the supply of adequate housing, especially for persons of low and moderate income, promote sound economic growth and employment and provide a viable alternative to disorderly urban growth. 42 U.S.C. 4501; see also 42 U.S.C. 4511(f). To achieve its broad commitment, Congress envisioned that the federal government, acting through the Community Development Corporation, 42 U.S.C. 4532, would assist four general types of new communities:
 
 
 21
 (1) Economically balanced new communities within metropolitan areas, which would serve as alternatives to urban sprawl; (2) Additions to existing smaller towns and cities which can be economically converted into growth centers to prevent decline and accommodate increased population; (3) Major new-town-in-town developments to help renew central cities, including the development of areas adjacent to existing cities, in order to increase their tax base; and (4) Free standing new communities where there is a clear showing of economic feasibility, and which would be built primarily to accommodate expected population growth.
 
 
 22
 H.R.Rep.No. 91-1556, U.S.Code Cong. & Admin.News, 91st Cong., 2d Sess., at pp. 5582, 5587-5588 (1970). As a result of its study of the problem, Congress found that the development of such new communities on a national scale had been crippled by the financial and administrative difficulties 'of raising a large initial investment which would yield a delayed, irregular cash return; of assembling suitable sites of sufficient size; and in coordinating site and related improvements among all involved public and private sectors,' Sierra Club v. Lynn, supra, 364 F.Supp. at 838; see 42 U.S.C. 4511(e). Thus Congress provided in the Act for several forms of federal assistance including guarantees of the debt obligations of public and private new community developers to assist in financing land acquisition and development and in constructing public facilities, 42 U.S.C. 4514.[2]
 
 
 23
 After a developer has successfully traversed the application process and accepted an offer of commitment, the terms and conditions under which he must operate are negotiated with HUD and executed in a project agreement. A trust indenture and a development plan are required and must set out (i) all physical, environmental, planning and construction commitments over the 30-year development period, (ii) social goals and special features of the project, (iii) special studies required of the developer with respect to technological innovations and other aspects of the project incapable of resolution prior to execution, and (iv) the pace, scope and detail of the developer's undertakings in terms of 1-year, 3-year and long-term periods. These documents are incorporated into the project agreement and, hence, ars enforceable at law. In addition, the developer is required each year to submit a new 1-year and 3-year plan and, if changed conditions warrant substantial alterations, a revised long-term plan. Substantial changes in any part of the development plan require approval by the Secretary.
 
 
 24
 The dynamic nature of the project's development process is intended to encourage flexibility in planning and to take advantage of new technology, research and innovation in the design and execution of new community development. A specific provision in the plan, which states that 'the developer shall comply with such further reasonable standards for environmental quality control as the Secretary may prescribe after consultation with other federal agencies pursuant to the National Environmental Policy Act of 1969,' assures that other federal agencies retain influence over the developer's activities regarding environmental quality after the agreement has been executed. Moreover, another provision extends the developer's commitment to maintain environmental quality control for such additional period of time after completion of development as the Secretary may determine to be appropriate, and HUD states that it will prepare draft and final environmental statements with respect to any subsequent major actions connected with any such project, i.e. actions that have significant environmental quality implications.
 
 
 25
 Plaintiffs contend that the Ranch (1) does not comport with the eight goals of the national urban growth policy announced by Congress;[3] (2) will promote the ten undesirable consequences which Congress found to result from unregulated patterns of urban development,[4] and (3) fails to meet the eligibility requirements for federal assistance under the Act. The district court concluded that HUD did not act arbitrarily, capriciously or unlawfully when it found the Ranch to satisfy each section 4513 condition for the 18 million dollar federal financing guarantee.[5] None of these district court findings can be characterized on this record as clearly erroneous. Furthermore, the national urban growth policy and the detrimental effects of present patterns which Congress codified operate only as guideposts to inform the Secretary's discretion and judicial review of his substantive decision. Neither creates any judicially enforceable rights.
 
 
 26
 Urging that HUD made no studies of the Ranch's impact on San Antonio urban problems (transportation facilities, minority and low income distribution, inner city tax base, balanced growth or revitalization of the central city), plaintiffs argue that the Ranch cannot be consistent with comprehensive planning for the entire urban area, as required by section 4513(a)(4) and HUD regulations (since no such plan exists), and that Bexar County, which must become responsible for governing and servicing the development, was never asked to approve the Ranch, as mandated by section 4513(a)(5).
 
 
 27
 The administrative record demonstrates that from the beginning HUD conceived of the Ranch as an integral element of the entire San Antonio community. The myriad economic, marketing, environmental and urban studies indicated that the project would provide a viable alternative (preserving and enhancing the existing natural amenities) to the rapid and disorderly urban growth projected for the northwest quadrant of Bexar County, an area devoid of governmental land use regulations or comprehensive water resource management planning. It is anticipated that this growth phenomenon will be exacerbated by the nearby construction of the University of Texas at San Antonio and the South Texas Medical Center. Thus, the orderly development of the Ranch should advance the goals of Title VII by retarding the expected and otherwise inevitable urban sprawl over the aquifer through implementation of a comprehensive land use plan which institutes demanding environmental controls in an ecologically sensitive area as well as by contributing to the welfare of the entire San Antonio community.
 
 
 28
 HUD evaluated the project's feasibility and its interrelation with the City of San Antonio by examining regional growth trends, population and employment distribution, market potentials, adequacy of regional transportation facilities and the long-term fiscal and economic impact of the Ranch on its adjacent political jurisdictions. These areas of concern were treated in the August 1971 report of the Assistant Secretary of HUD to the Community Development Board of Directors. He examined and the Board approved the Ranch with respect to each requirement of section 4513 and all applicable HUD regulations. To allay fears that the Ranch would counteract efforts to revitalize the downtown area of San Antonio, the developer submitted expert studies to the City Council that indicated a minimally harmful, if not an overall beneficial, economic impact on the city and its tax base from the project. As a result the City Council rescinded its prior unfavorable position as to the Ranch and in February of 1972 voted to adopt a resolution supporting annexation of the Ranch in the future and to execute an agreement of cooperation with the developer: (a) to institute measures to protect the Edwards reservoir from pollution, (b) to channel all urban-type federal grants through the City, (c) to seek assistance from the developers with the planning, analysis and feasibility studies for a possible Title VII new-town-in-town project in San Antonio, and (d) to provide water, gas, electricity, sewerage and other municipal services to the Ranch under contract with the developer. In responding to comments to the 'final' environmental impact statement, HUD stated that it would give full consideration to a new-town-in-town community in San Antonio regardless of the final action it took as to the Ranch.
 
 
 29
 Not only did both HUD and the developer endeavor to work closely and cooperate fully with state, local and city officials, the record also shows that the Ranch project 'is consistent with comprehensive planning . . . determined by the Secretary to provide an adequate basis for evaluating the new community development program in relation to other (state, local and private) plans and activities . . .,' 42 U.S.C. 4513(a)(4), and 'has received all governmental reviews and approvals required by State or local law, or by the Secretary,' 42 U.S.C. 4513(a)(5).
 
 
 30
 At the project's inception, no governmental entity exercised planning authority over the proposed site. 'Neither governmental controls over land use nor comprehensive and cohesive water resource management plans then existed in this area of Bexar County.' Sierra Club v. Lynn, supra, 364 F.Supp. at 839. Bexar County, which was the only governmental body with jurisdiction over the entire ranch, had only residential subdivision regulations. Consequently, HUD selected the Alamo Area Council of Governments to conduct a review of the Ranch in compliance with the Office of Management and Budget Circular A-- 95, which in general requires that an applicant for Title VII assistance notify the appropriate clearing house for the area in which the project is located of its intent to apply for such assistance in order to afford the clearing house and other interested local agencies an opportunity to comment on the proposed project. The district court determined that 'the Alamo Area Council of Governments . . ., the Water Board of the City of San Antonio, the City of San Antonio Public Service Board, the Texas Water Quality Board, the Governor's office, and the Northside Independent School District had reviewed the project and decided that (the Ranch) was consistent with the comprehensive regional plan.' 364 F.Supp. at 839.
 
 
 31
 Title VII does not state that the existence of a comprehensive regional land use plan is a condition precedent to federal assistance or that if no such plan is in effect, the Secretary must exercise his statutory authority to make conprehensive planning grants available to official governmental planning agencies where rapid urbanization is expected to occur on property to be developed as a new community, see 40 U.S.C. 461. In this vein, draft HUD regulations provide that 'the area within which a new community is to be situated must be covered by a comprehensive areawide plan or by ongoing planning promulgated or carried on by a duly authorized agency.' Proposed HUD Reg. 32.7(f), 36 Fed.Reg. 14208 (1971). These regulations also state that the comprehensive planning for the area must, in the secretary's judgment, be sufficiently detailed to provide a reasonable basis for evaluating the relationship of the proposed new community to other state, local and private plans and activities and that in those areas with a regional planning agency certified by the secretary, consistency must be found between the new community and the planning conducted by such agencies.
 
 
 32
 Plaintiffs do not assert that the Alamo Area Council was improperly certified by HUD or defaulted in its A-95 and regional planning responsibilities. There is no evidence that the council (among whose 16 members were representatives from plaintiff-intervenors, Edwards Underground Water District and Bexar County) inadequately discharged its planning and reviewing functions or erroneously determined that the Ranch was a viable project. Its conclusions were independently corroborated by various other local governmental agencies and were approved by the district court. Finally, that no official endorsement of the Ranch by Bexar County is required by state law is verified by a letter to HUD approving the Ranch from Bexar County Commissioners Court Judge Blair Reeves, who stated that though the county had no planning or zoning responsibility under existing state law, he found the project to be consistent with the San Antonio metropolitan area goals. This point was mooted in April of 1974 when the City Council of San Antonio voted to extend the city's extra-territorial jurisdiction over the Ranch from 58% To 100% Of the proposed site.
 
 
 33
 The record before us does not support the claim that HUD failed to consider all relevant Title VII factors in reaching its decision or that the decision itself manifests a clear error in judgment. The legislative history of Title VII and HUD regulations thereunder clearly contemplate federal assistance for 'free standing and self-sufficient new communities away from existing urban centers where there is a clear showing of economic feasibility, primarily . . . to accommodate (expected) population growth,' as well as for new communities in metropolitan areas that are designed to combat urban sprawl and to renew deteriorating central cities. See proposed HUD Reg. 32.7(a), 36 Fed.Reg. 14207 (1971). We hold that Secretary Lynn acted neither arbitrarily nor capriciously, nor failed to act in accordance with law when he determined to grant the developers of the Ranch federal assistance under the Urban Growth and New Community Development Act.
 
 II
 National Environmental Policy Act of 1969
 
 34
 NEPA was enacted to promote a national policy of 'productive and enjoyable harmony between man and his environment,' 42 U.S.C. 4321, by demanding attention to environmental values and instituting an implementing methodology which would assure that these values were incorporated in agency planning and decision making processes. Because HUD's commitment to guarantee 18 million dollars in bond obligations for the Ranch constituted a major federal action 'significantly affecting the quality of the human environment,' that decision became subject to the 'full disclosure' provisions of NEPA, 42 U.S.C. 4332(2) (c). As a result HUD filed three environmental impact statements -- a draft statement on September 13, 1971, a final statement on January 20, 1972, and an addendum to the final statement on August 24, 1972.
 
 
 35
 The district court concluded that the final statement, as supplemented by the addendum, 'though possibly not completely exhaustive in every respect, is sufficient to permit a reasoned decision as to the environmental effects of (the Ranch)' and 'meets all the requirements for the 'detailed statement' required by NEPA . . ..' 364 F.Supp. at 842. Furthermore, the court determined that the Secretary's substantive commitment decision was neither arbitrary nor capricious nor an abuse of discretion since 'HUD has complied with the goal of NEPA, . . . by '(using) all practicable means, consistent with other essential considerations of national policy' to carry out our nation's environmental policy.' 364 F.Supp. at 844.
 
 
 36
 Plaintiffs attack these findings, contending that (1) the agency's offer of commitment to the developer was in violation of HUD regulations and Council on Environmental Quality guidelines since it was extended before the thirty-day period for circulation of the impact statement for public comment had expired; (2) the final statement and addendum are unacceptable because both were improperly delegated to and represent the work product of the developer and his experts with little independent analysis or input from HUD and because the offer of commitment was not withdrawn pending completion of the additional environmental studies; (3) the supplemented final statement does not measure up to the requirements of NEPA; and (4) HUD's decision of commitment is arbitrary and capricious since it gave insufficient weight and consideration to environmental factors. In related contentions, plaintiffs assert that HUD's treatment of alternatives to the proposed project in the statement was deficient and that in accordance with the Urban Growth and New Community Development Act, HUD was obligated to consider and develop the suitability of alternative sites for the project.
 
 
 37
 To support their first issue-- procedural irregularities at the agency vitiated HUD's offer of commitment-- plaintiffs point to an October 1971 decision by the Community Development Board of Directors 'to authorize an offer of commitment at the earliest appropriate time' and to a 'draft' offer of commitment allegedly communicated from HUD to the developer on February 15, 1972, a date well before expiration of the thirty-day statement circulation period required by guidelines of the Environmental Protection Agency, 40 C.F.R. 6.15 (1973), the Council on Environmental Quality, 40 C.F.R. 1500.11(b), 38 Fed.Reg. 20556 (1973), and HUD regulations, HUD Handbook 1390.1(5.) (d.)(2), 38 Fed.Reg. 19187 (1973). Furthermore, plaintiffs argue that since the final statement, dated and filed with the Council on Environmental Quality on January 20, was not received until three days later, the February 23 offer of commitment also preceded expiration of the circulation period.
 
 
 38
 The short answer is that the Council on Environmental Quality guidelines, although highly persuasive, do not govern compliance with NEPA. Sierra Club v. Callaway, supra; Hiram Clarke Civic Club, Inc. v. Lynn,476 F.2d 421 (5th Cir. 1973). The draft HUD Title VII Regulations, which have never been formally adopted, were uppermost in the minds of the Community Development Board of Directors at their February 15 meeting when they authorized Assistant Secretary Jackson 'to determine at the expiration of the thirty-day period whether an offer of commitment should be issued . . ..' More importantly, the record is clear that the February 23 offer of commitment followed the circulation of the impact statement to the Council on Environmental Quality and other public agencies and groups by more than the specified thirty days. Finally, that conditional offer was lawfully issued pursuant to 42 U.S.C. 4513, 4514, and draft HUD regulations. Proposed HUD Reg. 32.23, 36 Fed.Reg. 14212-13 (1971).
 
 
 39
 Neither is the commitment offer or the impact statement fatally undermined by the direct participation of the developer and his experts in the underlying environmental and other studies. There is no NEPA prohibition against a state agency, financially interested private contractor or a new community applicant providing the federal agency, which must of necessity work with these parties, data, information, reports, groundwork environmental studies or other assistance in the preparation of an environmental impact statement. See Iowa Citizens for Environmental Quality, Inc. v. Volpe, 487 F.2d 849 (8th Cir. 1973); Citizens Environmental Council v. Volpe, 484 F.2d 870 (10th Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). NEPA demands only that 'the applicable federal agency must bear the responsibility for the ultimate work product designed to satisfy the requirement of 102(2)(c).' Life of the Land v. Brinegar, 485 F.2d 460, 467 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). NEPA's commands, however, do not permit the responsible federal agency to abdicate its statutory duties by reflexively rubber stamping a statement prepared by others. The agency must independently perform its reviewing, analytical and judgmental functions and participate actively and significantly in the preparation and drafting process. See Greene County Planning Board v. F.P.C., 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). HUD did no less here.
 
 
 40
 Non-degradation of the aquifer and ranch environment were paramount considerations throughout the entire HUD review of the Ranch application. To this end an inter-disciplinary team of New Communities Development staff members prepared and compiled each of the three environmental statements after independently reviewing data, information and comments provided by the developer's experts and other interested public agencies and groups. To obtain further verification, HUD retained a geologist and his staff of three associates to supervise and analyze the supplemental environmental studies and review every aspect of the project, especially the water quality monitoring program and the proposed environmental controls. His report and favorable conclusions were included with those studies in the addendum prepared by the New Communities Development staff.
 
 
 41
 In the absence of bad faith or misplaced reliance, an agency faced with numerous applications for assistance and endowed with finite internal resources to implement congressional policy cannot be expected to ignore useful and relevant information merely because it emanates from an applicant. This does not mean it may substitute the applicant's efforts and analysis for its own. The guidelines of the Council on Environmental Quality and the Environmental Protection Agency regulations regarding preparation of impact statements clearly contemplate submission of initial environmental information by the applicant to the agency. See EPA Reg., 40 C.F.R. 6.21(c) (1973); CEQ Guidelines, 40 C.F.R. 1500.7(c), 38 Fed.Reg. 20553 (1973); see also HUD Handbook 1390.1(5.), 38 Fed.Reg. 19184-87 (1973). In view of HUD's active participation and independent preparation of the impact statement and addendum, the district court did not err when it failed to conclude that the agency improperly delegated its statutory responsibilities to the developer.
 
 
 42
 Whenever an agency dicision to act precedes issuance of its impact statement, the danger arises that consideration of environmental factors will be pro forma and that the statement will represent a post hoc rationalization of that decision. NEPA was intended to incorporate environmental factors and variables into the decisional calculus at each stage of the process. 'This means that draft statements on administrative actions should be prepared and circulated for comment prior to the first significant point of decision in the agency review process.' CEQ Guidelines, 40 C.F.R. 1500.7(a), 38 Fed.Reg. 20552 (1973). The impact statement is the central, independent component of NEPA's decision-making methodology since it 'provides a basis for (a) an evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative course of action.' Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 833 (1972).
 
 
 43
 In this case, HUD's draft statement preceded its first significant decision, the October 1971 authorization by the Community Development Board of Directors of an offer of commitment at the earliest appropriate time. However, that the draft and final statement were totally inadequate under NEPA is signaled by HUD's conditioning its offer on a comprehensive study of the recharge zone and on Community Development and Texas Water Quality Board approval of the measures to be instituted to protect the aquifer. The 'final' impact statement itself acknowledged the lack of knowledge regarding the effect on the acquifer of storm water runoff, which it identified as the major pollution threat, and called for further investigation before, during and after construction of the Ranch. Because the district court's order holding this litigation in abeyance and the developer's agreement to HUD's call for a moratorium on construction effectively maintained the status quo pending completion of the August addendum, it was not incumbent on the court below to require that HUD withdraw its commitment. The offer was contingent, stating that the Community Development Board 'is under no obligation to enter into a project agreement or to guarantee your debt obligation until and unless' the Board has affirmatively found that each specified condition has been met. Post-submission efforts to rehabilitate the statement to comport with NEPA's provisions or to minimize adverse environmental consequences and maximize benefits should not be barred by initial inadequacies. The goal of NEPA is a better envoironment. While formally correct statements and technical compliance with the Act and complimentary guidelines are required, an initial finding of section 102 noncompliance must not irrevocably preclude eventual compliance. HUD's compliance with NEPA must be measured by the contents of the final impact statement as supplemented by the later addendum.
 
 
 44
 As a further point in their multifaceted appellate offensive, plaintiffs contend that the supplemented statement did not comply with section 102(2)(C) because it failed (1) to examine the secondary or indirect environmental impacts from expected neighboring 'parasite' developments; (2) to set out a cost-benefit analysis of the project; (3) to consider cumulative impacts; (4) to discuss adequately the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) to treat fully outside comments and opinions. A cursory examination of the impact statement, addendum and supporting documents demonstrates each of these assertions lack of substance.
 
 
 45
 The supplemented statement pointed to statistics indicating continued explosive population growth in the northwest quadrant of Bexar County and the probabilities that the influx of unregulated, low density subdivisions would be accelerated by the expanded network of regional highways and that the Ranch would tend to attract parasite settlements by as many as 40,000 persons along its outskirts. The statement also warned of the concomitant need for appropriate land use and zoning controls to protect the acquifer from accompanying septic tank discharge and other pollution and to insure that such developments were consistent with the plan, patterns and controls established for the Ranch. The developer promised to cooperate with the Alamo Area Council, the City of San Antonio and the Texas Water Quality Board in establishing the necessary regulatory controls. Moreover, in responding to the district court's order requiring the Edwards Water District and Texas Water Quality Board to file with the court semi-annual reports as to development over the aquifer, its effect and the environmental control measures being implemented, the Water Board indicated that it intended to incorporate virtually all of the HUD requirements imposed on the Ranch into an order regulating all development activities over the aquifer.
 
 
 46
 Similarly, exhibits in the addendum disclosed the expected cumulative impact of the Ranch on population distribution, land use patterns and the financial and economic resources of Bexar County and the surrounding areas. Unavoidable adverse environmental effects, irretrievable commitments of resources and other environmental costs and risks were identified and found not to outweigh the benefits of the Ranch in protecting and enhancing the Ranch site as well as avoiding the onset of urban sprawl. That the factors in this cost-benefit analysis are generally imprecise and unquantifiable does not render the result inadequately detailed. NEPA does not demand that every federal decision be verified by reduction to mathematical absolutes for insertion into a precise formula. Land use regulation over the aquifer was seen to advance its long-run productivity as against the adverse short and long-term effects of uncontrolled development. Advance planning, careful monitoring of water quality and stringent environmental controls should assure the continued integrity of the aquifer if such measures are extended throughout the recharge zone. Finally, all comments received as to each statement during the circulation period were attached and included in the supporting documentation. Many of the responses to the draft statement and HUD's replies thereto are reflected in the two succeeding statements.
 
 
 47
 'NEPA requires that an agency must-- to the fullest extent possible under its other statutory obligations-- consider alternatives to its action which would reduce environmental damage.' Calvert Cliffs' Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1128 (1971). In its discussion of alternatives, HUD proposed (a) taking no action, (b) requiring actions of a substantially different nature that would provide similar benefits with varying environmental impacts and (c) approving a project of different size, scope or design with less significant environmental impacts. The no action alternative was unattractive since anticipated uncontrolled development over the recharge zone posed a greater threat to the aquifer. Just as adverse impacts could not be avoided by refusing financial assistance to the Ranch, neither could they be precluded by delaying the project 3 to 5 years until proposed but unenacted state or federal land use legislation might result in a comprehensive plan for the recharge zone. The second alternative encompassed approving the project on a site off the recharge zone. This proposal was discarded because it would produce the same adverse environmental results as no action and would not satisfy the demand for housing in the northwest quadrant of Bexar County. Approval of a project smaller in scope or of less costly design on the Ranch site under the third alternative would not provide the housing necessary to accommodate most of the area's potential residents. Neither would it incorporate the economies of planning and funding to be found in a larger project nor exert such a beneficial influence on the surrounding area.
 
 
 48
 Asserting that HUD's discussion of alternatives is conclusory, superficial and self-serving, plaintiffs contend that the impact statement is fatally deficient because it fails to mention the acquisition of the recharge zone as a park or game preserve, the modification or elimination of federal assistance programs so as to discourage development over the recharge zone, the development of a different type or design of new community in another area of Bexar County, or any consideration or development of alternative sites for the project off environmentally sensitive areas. In a related contention, plaintiffs argue that Title VII, which is a guidepost for application of NEPA in this urban-suburban setting, compels HUD to consider alternative locations for new communities in evaluating an application for Title VII assistance.
 
 
 49
 It is true that the scope and extent of HUD's treatment of alternatives was less than exhaustive. Its sufficiency under NEPA, however, must be judged in light of the nature of the federal action and the underlying implementing federal legislation. The agency must consider appropriate alternatives which may be outside its jurisdiction or control, and not limit its attention to just those it can provide, see Natural Resources Defense Council, Inc. v. Morton, supra. Nevertheless, compliance with the NEPA command that an agency 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources,' 42 U.S.C. 4332(2)(d), must be judged against a rule of reason. 'There is no need for an (impact statement) to consider an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative.' Life of the Land v. Brinegar, supra, 485 F.2d at 472.
 
 
 50
 In this light the statement cannot be condemned for its failure to discuss either the acquisition of the recharge zone as a park at a prohibitive cost, or the elimination of all federal assistance to any development over the recharge zone. Furthermore, HUD's Title VII responsibility is limited to approving or disapproving, in accordance with the statute's provisions, new community applications. Although the Act permits HUD upon specific authorization of the President 'to plan and carry out largescale projects' on federally owned lands to demonstrate the development of and serve as models for new communities, 42 U.S.C. 4524, this statutory authority does not obligate the agency to search out a competing applicant willing to develop and finance a project on an alternate site or to work up a counter-proposal of its own before it can pass on the merits of a properly submitted new community application. 'There can be no merit to plaintiff's claim that HUD cannot approve an otherwise eligible project merely because they have discovered vacant land in an area that they believe may be better suited for a new community than the existing site.' Sierra Club v. Lynn, supra, 364 F.Supp. at 839.
 
 
 51
 None of the alternative sites in Bexar County suggested by the plaintiff met all the eligibility requirements of Title VII. Absent a competing applicant, HUD's prerogatives ultimately consisted of accepting or rejecting the application before it. The impact statement explored the consequences of both courses of action. If HUD is to discharge fully its Title VII and NEPA duties, it must also review the available alternatives in planning, design and placement of a new community. The impact statement adequately discussed these aspects of the Ranch. When the statement is read with its supporting documentation, it furnishes sufficient information 'to permit a reasoned choice of alternatives so far as environmental aspects are concerned.' Natural Resources Defense Council, Inc. v. Morton, supra, 458 F.2d at 836. Since the statement was not deficient in approach and reflected a basis in good faith objectivity, we hold that it fully complied with NEPA.
 
 
 52
 Finally, plaintiffs assert that the Secretary's substantive decision to approve federal assistance to the developers of the Ranch gave insufficient weight to the environmental risks inherent in constructing a city of 88,000 persons over an area supplying water to more than 1,000,000 residents. The environmental studies indicated that domestic sewage, solid waste, accidental spills of dangerous liquids and storm water run-off posed the greatest threats to the integrity of the aquifer. The district court summarized well the pervasive measures required by HUD to protect the water quality of the underground reservoir. It suffices to refer the interested reader to that cogent exposition with the observation that the precautions taken clearly supported the court's determination of their adequacy. Sierra Club v. Lynn, supra, 364 F.Supp. at 843.
 
 
 53
 Should it be discovered that pollutants have escaped the surface controls and threaten the aquifer, the developer must take remedial action, including installing an impervious lining in drainage channels over the 161 acres of land identified as especially porous. Any remedial action is subject to HUD and Texas Water Quality Board approval. The project agreement makes it the developer's legally enforceable duty to comply with all present and future environmental quality standards. The developer has agreed to undertake measures to minimize soil erosion and control of sediment and water run-off during the construction phases. To effectuate its duty of quality control and inspection of public improvement construction projects, the developer in conjunction with the City of San Antonio, the Texas Water Quality Board and the Texas State Department of Health has agreed to create an environmental committee, an architectural review board and to employ an independent inspection agent, whose reports will be available to all public and other regulatory agencies. We view the efforts expended to protect the aquifer as substantial and apparently efficacious. The Secretary's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
 
 III.
 
 54
 Water Pollution Prevention and Control Act Amendments of 1972
 
 
 55
 Congress enacted the Federal Water Pollution Control Act amendments of 1972, Pub.L.No. 92-500, 86 Stat. 816, 33 U.S.C. 1251 et seq., in order 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' 33 U.S.C. 1251(a). To this end the administrator of the Environmental Protection Agency is directed, in cooperation with other federal, state and local agencies, to 'prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters. In the development of such comprehensive programs due regard shall be given to the improvements which are necessary to conserve . . . the withdrawal of such waters for public water supply, agricultural, industrial, and other purposes.' 33 U.S.C. 1252(a). The Act provides for federal and state enforcement of effluent limitations to be prescribed and of a discharge permit system. 32 U.S.C. 1319. Unless in compliance with the provisions of the Act, 'the discharge of any pollutants by any person shall be unlawful.' 33 U.S.C. 1311.
 
 
 56
 The district court concluded that plaintiffs had failed to state a claim under the Water Pollution Control Act because (1) this record does not reflect that the Environmental Protection Agency had established any water quality standards for the court to enforce, and (2) the scheme of environmental controls imposed should prevent any Ranch polluted water from reaching the aquifer. In this court, arguing from the dual premises that the Act establishes a federal policy of nondegradation of the Nation's surface and ground water supplies and that either the Ranch or the 'parasite' developments it will attract in adjacent areas will inevitably result in the degradation of the aquifer, plaintiffs contend that HUD's loan commitment violates the duty imposed on the agency by 33 U.S.C. 1368(c). This section provides in pertinent part that 'in order to implement the purposes and policies of this chapter to protect and enhance the quality of the Nation's water, the President shall . . . cause to be issued an order (1) requiring each Federal agency authorized to enter into contracts and each Federal agency which is empowered to extend Federal assistance by way of grant, loan, or contract to effectuate the purpose and policy of this chapter in such contracting or assistance activities . . ..' In Executive Order No. 11738, 38 Fed.Reg. 161 (1973), the President subsequently mandated that 'each Federal agency empowered to extend Federal assistance by way of grant, loan or contract shall undertake such procurement and assistance activities in a manner that will result in effective enforcement of the Clean Air Act and the Federal Water Pollution Control Act . . . .'
 
 
 57
 In the absence of evidence that the Ranch will pollute the aquifer and degrade established standards of water quality or that HUD's loan commitment contravened its duty to effectuate the Federal Water Pollution Control Act, we affirm the district court's determination that plaintiffs have failed to state a claim for violation of that Act. As the court below stated, the record is silent as to standards of water quality for the aquifer prescribed by the Environmental Protection Agency. It is undisputed that the developer must meet any state or federal water standards that may be established in the future. More importantly, the developer must act to prevent the Ranch from degrading the existing water quality in the aquifer. If the Ranch is discovered to be polluting the underground water supply, the developer has the legally enforceable duty to remedy the situation.
 
 IV.
 Attorneys' Fees
 
 58
 Convinced that this litigation, instituted by the plaintiffs as 'private attorney generals,' had advanced the public interest by ensuring that adequate precautions would be taken to protect the aquifer and by effectuating important congressional policy, the district court awarded plaintiffs 20,000 dollars in attorneys' fees, costs and expenses. Only the developers were cast in judgment for this award since HUD and Secretary Lynn were immunized by statute. See 28 U.S.C. 2412. Plaintiffs appeal from the award as inadequate. The developer cross-appeals from the award as improperly assessed against it. We reverse on the cross-appeal.
 
 
 59
 'The so-called 'American Rule' governing the award of attorneys' fees in the federal courts is that 'attorneys' fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor.' Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967).' F.D. Rich Co., Inc. v. United States, Industrial Lumber Co., Inc., 417 U.S. 116, 126, 94 S.Ct. 2157, 2163, 40 L.Ed.2d 703 (1974). Plaintiffs recognize that neither NEPA nor Title VII provide for the recovery of attorneys' fees. They had no contractual agreement with HUD or the developer concerning attorneys' fees.
 
 
 60
 The 'American Rule' has not served, however, as an absolute bar to the shifting of attorneys' fees even in the absence of statute or contract. The federal judiciary has recognized several exceptions to the general principle that each party should bear the costs of its own legal representation. We have long recognized that attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or where a successful litigant has conferred a substantial benefit on a class of persons and the court's shifting of fees operates to spread the cost proportionately among the members of the benefitted class. The lower courts have also applied a rationale for fee shifting based on the premise that the expense of litigation may often be a formidable if not insurmountable obstacle to the private litigation necessary to enforce important public policies.
 
 
 61
 F.D. Rich Co., Inc. v. United States, Industrial Lumber Co., Inc., supra, 417 U.S. at 129, 94 S.Ct. at 2165.
 
 
 62
 The power to award attorneys' fees in the absence of statutory or contractual authorization is rooted in the inherent power of a federal court to do equity in the face of 'overriding considerations.' See Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). Clearly, no such considerations within the ambit of the first two exceptions to the American Rule exist in this case. It would be improper to punish the developer or HUD, either as unsuccessful litigants, or for bad faith, vexatious or obdurate conduct in their defense of the action. Inapplicable also is the 'common fund' or 'common benefit' exception, which is founded on the unjust enrichment rationale that the entire class benefited by a plaintiff's efforts should share the cost of litigation. It shifts to the beneficiaries those costs that they would have incurred had they brought and prosecuted the suit. See Hall v. Cole, supra; Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). None of the benefits of this litigation cited by the district court have inured, except in the abstract, to the developer. The common benefit rationale could justify an award against a public agency or private entity which would be able to shift the costs in common to the members of the public who draw their water from the Edwards Aquifer. Clearly, the developer is not in a position to distribute the costs of this litigation to the one million residents of the Sna Antonio area who will benefit from the preservation of this water source.
 
 
 63
 The present case is almost identical to the The Wilderness Society v. Morton, 495 F.2d 1026 (D.C.Cir. 1974), petition for cert. filed, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1974). There the District of Columbia Circuit invoked the third exception to the American Rule to award attorneys' fees to plaintiff citizen groups who had acted as private attorney generals in litigation which, while not obtaining the ultimate relief sought, did act as a catalyst to effect a change that served the public interest. The litigation had blocked construction of the Trans-Alaska Pipeline until Congress subsequently enacted specific legislation permitting construction. One-half of the plaintiffs' attorneys' fees were assessed against Alyeska Pipeline Service Co., the private applicant under the Mineral Leasing Act, despite the fact that it was the Interior Department which had violated the Act and failed to comply with NEPA. The court reasoned that since 'Alyeska unquestionably was a major and real party at interest in this case, actively participating in the litigation along with the Government, we think it fair that it should bear part of the attorneys' fees.' 495 F.2d at 1036. The fees were arbitrarily halved and Alyeska was assessed one half. Since collection from the government was barred by statute, plaintiffs were required to absorb the other half. While Alyeska's participation in litigation that would have been finally adjudged improper but for congressional intervention might be cited as a distinguishing feature, the basic thrust of the majority position in the D.C. Circuit supports the action taken by the court below.
 
 
 64
 We decline to follow The Wilderness Society. This circuit has never assessed attorneys' fees against a party innocent of any wrongdoing.[6] In the absence of proof that the private party controlled the government agency's actions or caused its default, it cannot be cast in judgment as a result of the agency's shortcomings. The fact that the breach of duty involved was committed by one who is immune from liability for financial redress affords no basis for a shifting of fees.
 
 
 65
 It would be inequitable to assess attorneys' fees against the private developer in this case. Granting that plaintiffs performed a valuable public service in bringing this action which directly caused HUD's full compliance with NEPA on the Ranch project, it cannot be gainsaid that HUD was the only party that had breached a duty.[7] Congress directed the environmental obligations of NEPA against federal agencies alone. HUD was solely responsible for the initially deficient impact statement. The developer successfully defended this lawsuit. It defense was not shown to have been unreasonable or to have unduly protracted this litigation. The district court was incorrect in proceeding from the premise that 'attorneys' fees should be awarded unless the trial court can articulate specific reasons for a denial.' 364 F.Supp. at 848.
 
 
 66
 The result of governmental immunity in this case is to require plaintiffs to absorb their own legal expenses. Another solution for future cases must come from Congress rather than in whole or half from the pocket of an innocent party.
 
 V.
 Retention of Jurisdiction
 
 67
 In entering judgment for the defendants, the district court retained jurisdiction over this action for the purpose of ensuring future compliance with the safeguards imposed on the Ranch's development; monitoring the development of areas adjacent to the Ranch and new measures which may be taken to protect the recharge zone; and acting as a central depository and public information source for all future written materials relating to compliance with HUD's requirements. The Texas Water Quality Board and the Edwards Underground Water District were ordered to file semi-annual reports on the extent and effect of development over the recharge zone and the measures instituted for protection of the aquifer, as well as the status of legislation, proposals and plans to protect remaining portions of the recharge zone outside Bexar County. 364 F.Supp. at 846. We find no constitutional basis to support this continued exercise of federal judicial power.
 
 
 68
 Federal courts are empowered under Article III of the Constitution to rule only upon an actual 'case or controversy.' See, e.g., Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). With the rendition of a definitive judgment for defendants on the merits of each of plaintiffs' claims, affirmed by this court, the litigable aspects of the dispute are at an end unless further appellate proceedings are undertaken. The issues capable of judicial determination have been resolved; the rights and duties of the parties have been adjudicated.
 
 
 69
 The district court must abjure the role of a quasi-administrative agency for environmental affairs in Bexar and other affected counties. No evidence whatsoever indicates that HUD will fail to discharge faithfully its statutory functions. See SEC v. Medical Committee for Human Rights, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). No analogy properly can be drawn here to civil rights or school cases in which the litigation proceeded against a background of a long history of purposefully unlawful conduct. See, e.g., Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). If any defendant should be asserted to be acting in breach of its duties under HUD's commitment or the law, the present plaintiffs or others who may be affected are free to file another action based upon such asserted malfeasance. Of course, the judgment and grant of relief disposing of the litigation, could have compelled the parties to file in a convenient local public office such reports as they may in the future make that contain material of public interest. The court may so modify its judgment upon remand.
 
 
 70
 However, although 'mere voluntary cessation of allegedly illegal conduct does not moot a case . . .,' United States v. Concentrated Export Assn., Inc., 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968), federal jurisdiction must be founded upon at least a 'mere possibility (of recurrence) which serves to keep the case alive.' United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The record here discloses only the most speculative of possibilities that plaintiffs will find it necessary in the future to invoke judicial guidance of HUD's activities. As of today they can demonstrate no legal injury sufficient to present an actual case or controversy. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). There no longer remains any unadjudicated claim upon which relief can be granted. See Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973). 'A hypothetical threat, based on speculative facts, is not enough to support the jurisdiction of a Federal Court.' Alabama ex rel. Baxley v. Woody, 473 F.2d 10, 14 (5th Cir. 1973). In sum, we find on this record no jurisdiction to retain jurisdiction.
 
 VI.
 Conclusion
 
 71
 The judgment appealed from is affirmed except as to the award of attorneys' fees and the retention of jurisdiction. The cause is remanded for the entry of an order not inconsistent with this opinion.
 
 
 72
 Affirmed in part, reversed in part, and remanded.
 
 
 
 [1]
 In December of 1971 the Edwards Underground Water District, the San Antonio Independent School District, the Bexar County Commissioners Court and the San Antonio River Authority adopted resolutions opposing urban development over the aquifer. Each resolution was included in an August 1972 addendum to the final environmental impact statement
 
 
 [2]
 The eligibility requirements for Title VII financing guarantees are codified at 42 U.S.C. 4513:
 (a) A new community development program is eligible for assistance under this part only if the Secretary determines that the program (or the new community it contemplates)--
 (1) will provide an alternative to disorderly urban growth, helping preserve or enhance desirable aspects of the natural and urban environment or so improving general and economic conditions in established communities as to help reverse migration from existing cities or rural areas;
 (2) will be economically feasible in terms of economic base or potential for economic growth:
 (3) will contribute to the welfare of the entire area which will be substantially affected by the program and of which the land to be developed is a part;
 (4) is consistent with comprehensive planning, physical and social, determined by the Secretary to provide an adequate basis for evaluating the new community development program in relation to other plans (including State, local, and private plans) and activities involving area population, housing and development trends, and transportation, water, sewerage, open space, recreation, and other relevant facilities;
 (5) has received all governmental reviews and approvals required by State or local law, or by the Secretary;
 (6) will contribute to good living conditions in the community, and that such community will be characterized by well balanced and diversified land use patterns and will include or be served by adequate public community, and commercial facilities (including facilities needed for education, health and social services, recreation, and transportation) deemed satisfactory by the Secretary;
 (7) makes substantial provision for housing within the means of persons of low and moderate income and that such housing will constitute an appropriate proportion of the community's housing supply; and
 (8) will make significant use of advances in design and technology with respect to land utilization, materials and methods of construction, and the provision of community facilities and services.
 (b) A new community development program approved for assistance under this part shall be undertaken by a private new community developer or State land development agency approved by the Secretary on the basis of financial, technical, and administrative ability which demonstrates capacity to carry out the program with reasonable assurance of its completion.
 
 
 [3]
 (d) The Congress further declares that the national urban growth policy should--
 (1) favor patterns of urbanization and economic development and stabilization which offer a range of alternative locations and encourage the wise and balanced use of physical and human resources in metropolitan and urban regions as well as in smaller urban places which have a potential for accelerated growth;
 (2) foster the continued economic strength of all parts of the United States, including central cities, suburbs, smaller communities, local neighborhoods, and rural areas;
 (3) help reverse trends of migration and physical growth which reinforce disparities among States, regions, and cities;
 (4) treat comprehensively the problems of poverty and employment (including the erosion of tax bases, and the need for better community services and job opportunities) which are associated with disorderly urbanization and rural decline;
 (5) develop means to encourage good housing for all Americans without regard to race or creed;
 (6) refine the role of the Federal Government in revitalizing existing communities and encouraging planned, large-scale urban and new community development;
 (7) strengthen the capacity of general governmental institutions to contribute to balanced urban growth and stabilization; and
 (8) facilitate increased coordination in the administration of Federal programs so as to encourage desirable patterns of urban growth and stabilization, the prudent use of natural resources, and the protection of the physical environment. 42 U.S.C. 4502(d).
 
 
 [4]
 (b) The Congress further finds that continuation of established patterns of urban development, together with the anticipated increase in population, will result in (1) inefficient and wasteful use of land resources which are of national economic and environmental importance; (2) destruction of irreplaceable natural and recreational resources and increasing pollution of air and water; (3) diminished opportunity for the private homebuilding industry to operate at its highest potential capacity in providing good housing needed to serve the expanding population and to replace substandard housing; (4) costly and inefficient public facilities and services at all levels of government; (5) unduly limited options for many of our people as to where they may live, and the types of housing and environment in which they may live; (6) failure to make the most economic use of present and potential resources of many of the Nation's smaller cities and towns, including those in rural and economically depressed areas, and decreasing employment and business opportunities for their residents; (7) further lessening of employment and business opportunities for the residents of central cities and of the ability of such cities to retain a tax base adequate to support vital services for all their citizens, particularly the poor and disadvantaged; (8) further separation of people within metropolitan areas by income and by race; (9) further increases in the distances between the places where people live and where they work and find recreation; and (10) increased cost and decreased effectiveness of public and private facilities for urban transportation
 42 U.S.C. 4511(b).
 
 
 [5]
 The findings were:
 (1) The project will provide an alternative to disorderly urban growth;
 (2) It will be economically feasible, in that it will capture more than 15% Of the projected growth of Bexar County, because of its wide range of housing amenities and the superior environment;
 (3) It will contribute to the welfare of the entire area, as existing septic tanks will be replaced with storm and sanitary sewers, and as industrial and commercial facilities will be placed in a setting encompassing a broad price range of housing;
 (4) It is consistent with comprehensive physical and social planning;
 (5) It has received all governmental reviews and approvals required by State or local law;
 (6) It will contribute to desirable living conditions in the community, and will be characterized by well balanced and diversified land use patterns, and will include or be served by adequate public, community, and commercial facilities;
 (7) It makes substantial provision for housing within the means of persons of low and modern income;
 (8) It will make significant use of advances in design and technology with respect to land utilization, materials and methods of construction, and the provision of community facilities and services; and
 (9) A basis of financial, technical, and administrative ability which demonstrates capacity to carry out the program with reasonable assurance of its completion has been shown.
 Sierra Club v. Lynn, supra, 364 F.Supp. at 839.
 
 
 [6]
 Cooper v. Allen, 467 F.2d 836 (5th Cir. 1972); 493 F.2d 765 (5th Cir. 1974) and Lee v. Southern Home Sites Corp., 429 F.2d 290 (5th Cir. 1970), relied upon by the district court, are not to the contrary
 
 
 [7]
 Because plaintiffs were unsuccessful in their other claims of statutory violations, only NEPA compliance is pertinent